**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 14 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

RENA LOCKARD,

      Plaintiff-Appellee,

v.

PIZZA HUT, INC., a corporation,
doing business as Pizza Hut; A&M
FOOD SERVICES, INC., a
corporation, doing business as Pizza
Hut,

      Defendants-Appellants

Nos. 97-7027
97-7078

---

Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. CV-96-294-S)

---

Richard W. Wassall (Harry A. Parrish with him on the briefs) of Knight,
Wilkerson, Parrish & Wassall, Tulsa, Oklahoma, for Defendants-Appellants.

Thomas J. Hadley of Stamper, Hadley & Reasor, Antlers, Oklahoma (David M.
Kennedy of Kennedy, Minshew, Campbell & Morris, Sherman, Texas, with him
on the briefs), for Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO**, and **HENRY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Rena Lockard brought suit against Pizza Hut, Inc. and A&M Food Service, Inc. asserting claims under Title VII for hostile work environment sexual harassment. The jury returned a verdict against defendants, awarding Ms. Lockard $200,000 in compensatory damages. The district court denied defendants' motions for judgment as a matter of law, for a new trial and for remittitur. The district court also awarded Ms. Lockard $1514.21 in costs and $37,088.75 in attorneys' fees. Defendants appeal. We affirm the judgment against A&M and reverse the judgment against Pizza Hut.

## I

A&M Food Service, Inc. is a Pizza Hut franchisee that owns and operates the Pizza Hut restaurant in Atoka, Oklahoma. Pizza Hut, Inc. publishes policy bulletins and complaint procedures which are utilized by all Pizza Hut restaurants. Pizza Hut's employee orientation and training handbook, "Your Guide to Success," is distributed to each new employee at the time of hire. All employees are required to sign a document stating that they have received and reviewed the publication. The handbook includes, among other things, Pizza Hut's formal grievance procedure for any work-related concerns as well as a section specifically discussing the problem of sexual harassment. Pizza Hut's formal grievance procedure instructs employees to:

Step 1 ▼ Talk to your Manager and clearly state the problem and your desired

|        |     | solution. |
|--------|-----|-----------|
| Step 2 | ▼ | Not satisfied?  Write down your problem with your desired solution and send it to your Area Manager. Send a copy to your Division Human Resource Manager. |
| Step 3 | ▼ | If you receive a written response and still are not satisfied, feel free to respond, in writing, to your Market Manager. |

Aplt. App. at 574.  Employees who "are subjected to or have knowledge of sexual harassment or intimidation," however, also have the opportunity to "report [such conduct] immediately to [their] Division Human Resource Manager."  Id. at 575.  Pizza Hut's grievance procedure and sexual harassment policy are posted in every restaurant.  Moreover, if an employee desires "further information" regarding sexual harassment, she is directed to "ask [her] Manager for Policy #425."  Id.

Policy #425, after defining sexual harassment and providing examples of sexually harassing behavior, provides that "[s]uch conduct whether committed by supervisory or non supervisory personnel, co-workers or customers is specifically prohibited."  Id. at 562.  With regard to reporting incidents of harassment, Policy #425 further states that "[a]ny management employee who has knowledge of harassment or intimidation should report the incident to his or her Human Resource Manager, whether or not the victim requests that management become involved."  Id. at 562.

Pizza Hut also publishes a pamphlet for management employees entitled

"Pizza Hut's Policy on Harassment," which provides instructions on responding to and investigating complaints of sexual harassment. All Pizza Hut management employees are required to receive training on sexual harassment and are expected to review this pamphlet as part of that training. The pamphlet cautions managers against "ignor[ing] allegations or rumors that sexual harassment is occurring," directing them to "[r]espond immediately with concern." Id. at 558. When a manager becomes aware of *customers* who harass employees, the pamphlet specifically instructs such managers to contact the Human Resource Manager and/or Area Manager and to

> take such steps to correct the conduct, such as asking the customer to refrain from the conduct and if the customer persists, asking the customer to leave the restaurant.

Id. at 557.

Ms. Lockard was hired to work as a waitress for $2.35/hour plus tips at the Pizza Hut unit in Atoka in September 1993. Her W-2 form lists A&M as her employer. She was directly supervised by Micky Jack, who was the manager of Ms. Lockard's shift. Mr. Jack reported to Joyce Selby, the Unit Manager of the Atoka Pizza Hut, who was responsible for hiring. Ms. Selby in turn reported to Larry Acklin, the Area Manager for Pizza Hut units located in Eastern Oklahoma. As part of her employee orientation and training, Ms. Lockard signed a document stating that she had received and reviewed Pizza Hut's "Your Guide to Success."

-4-

Ms. Lockard's duties included closing the store after the restaurant stopped serving customers at 10 p.m. on weekdays and 11 p.m. on weekends. Upon occasion, she and Mr. Jack were the only Pizza Hut employees at closing time and Mr. Jack would often play one of his favorite songs "Freak Me" on the jukebox. The song contains sexually explicit lyrics. Ms. Lockard testified that she informed both Mr. Jack and Ms. Selby that she found this song offensive and asked Mr. Jack to stop playing it, to no avail. Other than playing offensive music, Mr. Jack never directly acted improperly toward her.

Ms. Lockard's more serious allegation of sexual harassment involved the failure of Mr. Jack to respond properly to the inappropriate conduct of two crude and rowdy male customers on November 6, 1993. Ms. Lockard testified that these two men had eaten at the restaurant several times previous to November 6 and had made sexually offensive comments to her, such as "I would like to get into your pants." After the two men made these remarks, Ms. Lockard informed Mr. Jack that she did not like waiting on them; however, the record contains no evidence that she told Mr. Jack why she did not like waiting on the men or that she ever relayed to him the substance of their remarks. On the evening of November 6, these customers again entered the restaurant. The wait staff, including younger male waiters, argued over who would seat them because no one on the staff wanted to serve them. Mr. Jack then instructed Ms. Lockard to wait on them.

-5-

After being seated by Ms. Lockard, one of the customers commented that she smelled good and asked what kind of cologne she was wearing. Ms. Lockard responded that it was none of his business, and the customer grabbed her by the hair. She informed Mr. Jack that one of the customers had pulled her hair and that she did not want to continue waiting on them, and asked Mr. Jack if he could find someone else to serve them. Ms. Lockard testified that Mr. Jack denied her request, stating "You wait on them. You were hired to be a waitress. You waitress." Aplt. App., Trial Tr. at 47. Ms. Lockard returned to their table with a pitcher of beer. As she reached to put the beer on the table, the customer pulled her to him by the hair, grabbed her breast, and put his mouth on her breast. At that point, Ms. Lockard told Mr. Jack that she was quitting and wanted to go home. She called her husband who picked her up.

The next day Ms. Selby telephoned Ms. Lockard to question her about the incident. Ms. Lockard related the events of the previous evening and asked Ms. Selby to obtain the names of the two customers. Ms. Selby provided Ms. Lockard with this information. Ms. Selby also asked Ms. Lockard whether she wished to continue working at Pizza Hut as a production person, which would not require her to come into contact with any customers, but Ms. Lockard declined the offer. Ms. Lockard provided Pizza Hut with her notice of termination on November 13, 1993. On the official Pizza Hut Notice of Termination/Resignation form signed

-6-

by Ms. Selby, the explanation given for the termination stated that Ms. Lockard "was sexual harrast [sic] by a customer–got understandly [sic] upset + quit." Aplee. Supp. App. at 1. For the two months she worked at Pizza Hut, Ms. Lockard earned a total of $1393.19.

Donna Lowrance, an employee of Pizza Hut, Inc., holds the position of Manager of Equal Employment Opportunity and Affirmative Action. Her responsibilities include handling all EEOC complaints filed against Pizza Hut restaurants nationwide. Upon receiving Ms. Lockard's EEOC complaint, Ms. Lowrance instructed Mr. Acklin, the Area Manager, to investigate the complaint and gather employees' statements concerning the alleged incident of harassment. Following this investigation, Ms. Lowrance wrote a letter to the EEOC, dated December 1994, setting out Pizza Hut's position on Ms. Lockard's sexual harassment charge. Pizza Hut denied the charge, asserting that Mr. Jack only became aware of the incident between Ms. Lockard and the male customers after the men had left the restaurant. Aplee. Supp. App. at 31.

At trial, Ms. Lockard testified she had been sexually assaulted by a friend of her father when she was a teenager. Although she had been able to cope with her prior sexual abuse before the November 6 incident, after the incident her emotional condition deteriorated significantly. Ms. Lockard testified she was frightened to be near men, even her father and her husband, and that her condition

prevented her from working. Several family members testified to changes in Ms. Lockard's behavior as a result of the incident, including her fear of going out in public. Ms. Lockard sought psychological counseling from Dr. Karen Rasile, who appeared as an expert witness at trial and stated that Ms. Lockard exhibited classic symptoms of post-traumatic stress disorder and major depression. After receiving treatment, Ms. Lockard's condition improved sufficiently so that she was able to resume working in 1995, approximately two years after the incident. Ms. Lockard received training to work in home health care, and at her request attends only to female patients.

Ms. Lockard brought suit against Pizza Hut, Inc. and A&M Food Service, Inc., alleging a Title VII claim of hostile work environment sexual harassment and a state law claim of intentional infliction of emotional distress. Ms. Lockard requested an amount greater than $50,000 in compensatory and punitive damages as well as costs and attorneys' fees. At the close of Ms. Lockard's case, defendants moved for judgment as a matter of law, seeking dismissal of the hostile work environment sexual harassment claim, the intentional infliction of emotional distress claim, Pizza Hut, Inc. as a party to the suit, and the punitive damages request for relief. The district court granted defendants' motion for judgment as a matter of law with regard to the state law claim and the issue of punitive damages, but denied the remainder of defendants' motion. The jury

returned a verdict in favor of Ms. Lockard and against Pizza Hut and A&M on the hostile work environment sexual harassment claim, awarding Ms. Lockard $200,000 in compensatory damages.

Defendants filed a post-trial motion for judgment as a matter of law, basing their renewed motion on the following grounds: (1) Ms. Lockard was employed by A&M, not Pizza Hut, and Pizza Hut therefore could not be liable on the sexual harassment claim; (2) the harassment suffered by Ms. Lockard was not sufficiently severe or pervasive to constitute an actionable claim of sexual harassment; and (3) Pizza Hut and A&M cannot be held vicariously liable for the alleged customer-created hostile work environment. In the alternative, defendants argued they were entitled to a new trial because: (1) the jury verdict was excessive and not supported by the evidence; (2) the district court erroneously allowed prejudicial testimony concerning Mr. Jack's homosexuality; and (3) the court erroneously allowed the rebuttal testimony of Mona Harrison, a co-worker of Ms. Lockard's at the time of the incident. Finally, defendants urged the court to order a remittitur of the jury verdict on the ground that it was excessive.

The district court summarily denied all defendants' post-trial motions and awarded Ms. Lockard $1514 in costs. Subsequently, the court awarded Ms. Lockard $37,088 in attorneys' fees. We now turn to defendants' consolidated appeals.

## II

Defendants first contend the district court erred in denying their motion for judgment as a matter of law, arguing Ms. Lockard failed to demonstrate that Pizza Hut was her employer, that she suffered harassment sufficiently severe or pervasive to create an actionable hostile work environment, or that Pizza Hut and A&M should be held vicariously liable for the alleged hostile work environment.

We review de novo a district court's determination of a motion for judgment as a matter of law, applying the same standard as the district court. Judgment as a matter of law is warranted "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997). "We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury. However, we must enter judgment as a matter of law in favor of the moving party if 'there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law.'" Harolds Stores, Inc. v. Dillard's Dep't Stores, 82 F.3d 1533, 1546 (10th Cir. 1996) (citation omitted) (quoting Fed. R. Civ. P. 50(a)). In conducting our review, we have construed "[t]he evidence and inferences therefrom . . . most favorably to the nonmoving party." Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1522 (10th Cir. 1997). We address

each argument in turn.

## A

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). An employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees." Id. § 2000e(b). An employee, in turn, is defined as "an individual employed by an employer." Id. § 2000e(f).

In order to establish a prima facie case under Title VII, Ms. Lockard was required to prove, among other things, that Pizza Hut, Inc., was her employer. See Frank v. U.S. West, Inc., 3 F.3d 1357, 1361 (10th Cir. 1993). Whether an entity is an employer under Title VII usually arises as an issue in the following contexts: (1) where a plaintiff who is directly employed by a franchisee or subsidiary wishes to hold the franchisor or parent company liable for the discriminatory conduct of its franchisee's or subsidiary's employees; and (2) where it is unclear whether a plaintiff is an independent contractor or an employee of an entity. Courts have struggled with a variety of tests to determine whether a plaintiff has demonstrated an employee-employer relationship for Title VII purposes. In Lambertsen v. Utah Dep't of Corrections, 79 F.3d 1024 (10th

-11-

Cir. 1996), we identified three approaches: (1) the common law agency inquiry;

(2) the "hybrid" common law-economic realities method; and (3) the single

employer or true economic realities test. Id. at 1024; see also 1 LEX K. LARSON,

EMPLOYMENT DISCRIMINATION § 4.02, at 4-11 to 4-12 (2d ed. 1998).

Under the common law agency inquiry, the focus is on whether the putative

employer "controls the means and manner by which work is accomplished."

Lambertsen, 79 F.3d at 1028. The hybrid method combines the focus on the

common law right to control with additional factors relating to the degree of

economic dependence of the worker on the putative employer. See id. at 1028; 1

LARSON, supra, § 4.02, at 4-12.[1] The third approach is used by courts that have

"turned for guidance to a test promulgated by the National Labor Relations

Board." Evans v. McDonald's Corp., 936 F.2d 1087, 1089 (10th Cir. 1991).

Under this approach, which is known as the "single employer," "economic

---

[1] These factors include:
> (1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.

Lambertsen, 79 F.3d at 1028.

realities," or "integrated enterprise" test, courts consider the following factors: interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control. See id. (citing McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933 (11th Cir. 1987)).

Unlike the "stringent" common law approach, which "tends to exclude the greatest number of persons from Title VII coverage," 1 LARSON, supra, § 4.02, at 4-12, courts adopting the single employer test have emphasized that a broad interpretation should be given to the employer and employee provisions of Title VII to effect its remedial purpose. See Armbruster v. Quinn, 711 F.2d 1332, 1336 (10th Cir. 1983). The single employer test is therefore the approach most urged by plaintiffs in Title VII actions. See, e.g., Lambertsen, 79 F.3d at 1029; Evans, 936 F.2d at 1089. The trend in Title VII cases appears to be in favor of adopting this test. See Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241 (2d Cir. 1995) ("We believe that the appropriate test under Title VII for determining when parent companies may be considered employers of a subsidiary's employees is the four-part [NLRB] test adopted by the Fifth, Sixth, and Eighth circuits."). We have yet to adopt the single employer test, having found it unnecessary in several cases to resolve the issue definitively. See, e.g., Lambertsen, 79 F.3d at 1029; Frank, 3 F.3d at 1362; Evans, 936 F.2d at 1090; see also Whitaker v. Professional

-13-

<u>Investors Ins. Group</u>, No. 91-5125, 1992 WL 279245, at *1 (10th Cir. Oct. 5, 1992).

Despite an abundance of case law on this issue, neither Ms. Lockard nor defendants cited to any relevant legal authorities either in the district court or on appeal to support their respective positions. Nonetheless, even assuming the lenient single employer test applies here, Ms. Lockard has failed to meet her burden of establishing that Pizza Hut was her employer.

Underlying the single employer test is the requirement "that there be sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer." <u>Armbruster</u>, 711 F.2d at 1337. The key factor of this four-part test is therefore whether the putative employer has centralized control of labor relations. <u>See</u> <u>Cook</u>, 69 F.3d at 1241; <u>Frank</u>, 3 F.3d at 1363; <u>Evans</u>, 936 F.2d at 1090. "The critical question is, '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" <u>Frank</u>, 3 F.3d at 1363 (quoting <u>Trevino v. Celanese Corp.</u>, 701 F.2d 397, 404 (5th Cir. 1983)).

In determining whether a parent corporation should be held liable for the acts of its wholly-owned subsidiary's employees, we have stated that a "parent's

broad general policy statements regarding employment matters are not enough" to make the required showing of centralized control over labor relations. Frank, 3 F.3d at 1362. "To satisfy the control prong, a parent must control the *day-to-day employment decisions* of the subsidiary." Id. (emphasis added). In holding that a franchisor was not a Title VII employer with respect to the employees of an independently owned franchise, we were not persuaded by evidence that the franchisor "may have stringently controlled the manner of its franchisee's operations, conducted frequent inspections, and provided training for franchise employees," when the franchisor did not have control over its franchisee's labor relations or financial control over the franchisee. Evans, 936 F.2d at 1090.

In contrast, the Second Circuit has held that control over labor relations was established where the evidence demonstrated that the parent ran its wholly owned subsidiary in a direct, hands-on fashion; applications for employment with the subsidiary went through the parent; all personnel status reports were approved by the parent; and the subsidiary cleared all major employment decisions with the parent. See Cook, 69 F.3d at 1241. Similarly, the Sixth Circuit has held that a parent company and its wholly owned subsidiary could be considered a single employer for Title VII purposes where the parent by practice and policy authorized all purchases over $200 made by its subsidiary; the parent handled its subsidiary's payroll and cash accounting, and monitored all sales shipments; and

the parent approved all of the subsidiary's hiring decisions. See Armbruster, 711 F.2d at 1338-39; see also Frank, 3 F.3d at 1363 (listing type of evidence routinely used to show interrelated operations and control over labor relations prongs; e.g., parent kept subsidiary's books, issued its paychecks, and paid its bills; parent and subsidiary had common employees, shared services, equipment, employees and office space; parent controlled subsidiary's payroll and benefit program).

Ms. Lockard points to the following evidence in the record to support her claim that Pizza Hut and A&M should be considered a single employer for the purpose of her Title VII suit: (1) the policies and procedures in effect at the Atoka restaurant were those of Pizza Hut; (2) Donna Lowrance, a Pizza Hut employee, handled Ms. Lockard's EEOC complaint against both A&M and Pizza Hut and set forth "Pizza Hut's position," Aplee. Supp. App. at 31; (3) Ms. Lowrance's position letter to the EEOC denying Ms. Lockard's charge "related" that Ms. Lockard was employed by "the Company," id.; and (4) Brian Cole was a vice-president of both A&M and Pizza Hut, Inc.

Our careful review of the record reveals that Ms. Lockard failed to present the type of evidence routinely required by courts to satisfy the showing of interrelated operations and control over labor relations required by the single employer test. In fact, the record does not contain even the most basic information about the relationship between the two entities, such as whether

-16-

A&M operates independent Pizza Hut franchises or whether A&M is a wholly-owned subsidiary of Pizza Hut. We only learned that A&M was a wholly-owned subsidiary of Pizza Hut at oral argument when we specifically asked counsel for Pizza Hut and A&M for this information.

Although the record establishes some common management between the two entities, it is not sufficient to satisfy the common management requirement of the single employer test. See Frank, 3 F.3d at 1364. Even A&M's status as a wholly-owned subsidiary of Pizza Hut merely demonstrates common ownership which, "standing alone, can never be sufficient to establish parent liability." Id.[2] The record simply contains no evidence from which a finder of fact could determine whether Pizza Hut controlled the day-to-day employment decisions of A&M, whether Pizza Hut made the final decisions regarding employment matters for A&M, or the degree of interrelatedness between the two companies. Although Pizza Hut's policies were utilized at the Atoka restaurant, Ms. Lockard has produced no evidence indicating what role, if any, Pizza Hut played in

---

[2] We have stated that the "doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances." Frank, 3. F.3d at 1362. In order to hold a parent company liable as an employer under Title VII, the parent must exercise a degree of control that exceeds that normally exercised by a parent corporation. See id. at 1363. As we discuss infra, Ms. Lockard has failed to put forth sufficient evidence for us to assess whether extraordinary circumstances or an excessive degree of control exists between Pizza Hut and A&M.

implementing or effecting these policies. The existence of the policies is not enough to demonstrate Pizza Hut's centralized control of A&M's labor relations.

Based on the record before us, we cannot conclude Ms. Lockard satisfied her burden of proving that Pizza Hut should be held liable as an employer under Title VII. We therefore reverse the district court's denial of defendants' motion for judgment as a matter of law on this ground. [3]

**B**

Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is "sufficiently severe or pervasive 'to alter the conditions [of the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir.1982)). The conduct must be both objectively and subjectively abusive, and need not lead to a nervous breakdown before Title VII comes into play. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).

---

[3] We note that the jury was not instructed to determine whether Pizza Hut was Ms. Lockard's employer under Title VII and therefore a proper party to the suit. We thus find ourselves in the somewhat unusual situation of reviewing whether the evidence is legally sufficient to sustain a finding which the jury never expressly made. Nevertheless, we have reviewed the record and conclude as a matter of law that Ms. Lockard failed to present sufficient evidence that the two companies were integrated.

-18-

The Supreme Court recognized that the standard for determining an actionable hostile work environment set forth in <u>Meritor</u> and reaffirmed in <u>Harris</u> is not and could not be "a mathematically precise test." <u>Id.</u> at 22. The Court provided some guidance for applying the standard by articulating the following nonexhaustive list of factors relevant to the determination:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

<u>Id.</u> at 23. The Court further emphasized that in deciding this issue courts should "look[ ] at all the circumstances" and that "no single factor is required." <u>Id.</u>

Ms. Lockard alleges that Mr. Jack created a hostile work environment when he played the sexually explicit song "Freak Me" on the jukebox and when he refused to address the harassing conduct of two male customers. Ms. Lockard testified, however, that she did not find the music in and of itself so offensive as to make her want to quit her job. We therefore question whether Ms. Lockard "subjectively perceive[d] the environment to be abusive," <u>id.</u> at 21, based solely on this conduct. We need not decide this issue because we conclude that the harassing conduct by the two male customers was sufficiently severe to create an abusive environment. We thus focus our attention on the acts of the customers.

Ms. Lockard testified that prior to November 6 these men had come into Pizza Hut on several occasions and had made "filthy" comments to her such as "I

-19-

would like to get into your pants." Aplt. App., Trial Tr. at 44. On the evening of November 6, they commented that Ms. Lockard smelled nice and one of the customers grabbed her by the hair. When Ms. Lockard returned to the table with their beer, the customer again pulled her hair, then grabbed her breast and placed his mouth on it. Ms. Lockard testified that as a result of the incident, her emotional condition deteriorated to the point that she feared going out in public, and that she was thus prevented from continuing to work. She sought psychological counseling for the emotional problems caused by this incident.

The conduct of these customers on November 6 was more than a mere offensive utterance. Grabbing Ms. Lockard's hair and breast while she attempted to take their orders and serve their beer is physically threatening and humiliating behavior which unreasonably interfered with Ms. Lockard's ability to perform her duties as a waitress. Defendants essentially argue that the physically threatening conduct of these two customers was simply a one-time incident and was therefore not pervasive enough to create an abusive environment, comparing the single incident here with the repeated incidents of sexual abuse suffered by the plaintiff in Meritor. However, in Harris the Court made clear that the "appalling conduct alleged in Meritor . . . merely present[s] some especially egregious examples of harassment. They do not mark the boundary of what is actionable." Harris, 510 U.S. at 22. The "frequency of the discriminatory conduct," id. at 23, is simply

-20-

one factor in the analysis, and "no single factor is required," id. Conduct is actionable if it is "sufficiently severe or pervasive." Meritor, 477 U.S. at 67 (emphasis added); see also Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2264 (1998); Harris, 510 U.S. at 21-22. We therefore disagree with defendants' assertions that a single incident of physically threatening conduct can never be sufficient to create an abusive environment. "[L]ooking at all the circumstances," as we must, Harris, 510 U.S. at 23, we are persuaded that the record contains sufficient evidence to support the jury's conclusion that the harassing conduct of the customers was severe enough to create an actionable hostile work environment.

## C

A&M asserts that even if a hostile work environment was created, Ms. Lockard's claim under Title VII must fail because an employer cannot be held vicariously liable for the harassing conduct of customers. We have not yet ruled on this issue and must therefore decide whether Title VII applies to acts of harassment by customers. If we answer this question in the affirmative, we must then determine the appropriate standard of employer liability for nonemployee harassment. Finally, we must determine whether Ms. Lockard has satisfied this standard.

EEOC regulations specifically provide that an

-21-

employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

29 C.F.R. § 1604.11(e) (1997). The First, Eighth, and Ninth Circuits have followed the EEOC's guidelines on the issue of harassment by nonemployees.

In Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848 (1st Cir. 1998), a female employee sued her employer under Title VII alleging that she was discharged from her job after complaining to her employer about the sexual advances made by a high-level executive of one of her employer's most important customers. The First Circuit upheld the jury's verdict for the plaintiff based on the customer's harassing behavior, stating that "employers can be held liable for a customer's unwanted sexual advances, if the employer ratifies or acquiesces in the customer's demands." Id. at 854. The court concluded the employer "not only acquiesced in the customer's demands, but explicitly told her to give in to those demands and satisfy the customer." Id.

In Crist v. Focus Homes, Inc., 122 F.3d 1107 (8th Cir. 1997), the plaintiffs were employed as caregivers by a for-profit residential home for individuals with developmental disabilities. J.L., a resident of the home, repeatedly sexually assaulted the plaintiffs. The plaintiffs reported the assaults to management, who failed to respond adequately, asking one plaintiff to allow J.L. to assault her in

-22-

front of the home's executives so they could view the conduct. The Eighth Circuit rejected the residential home's contentions that it could not be held liable for J.L.'s conduct because the home could not control his behavior. The court observed that defendants "clearly controlled the environment in which J.L. resided, and it had the ability to alter those conditions to a substantial degree." Id. at 1112.

In Folkerson v. Circus Circus Enter., Inc., 107 F.3d 754 (9th Cir. 1997), the plaintiff was a mime employed by a casino as a living doll. She brought a Title VII suit against the casino alleging that she was sexually harassed by a casino patron who touched her as she was performing and that she was fired in retaliation for rejecting the harassment by hitting the patron on the mouth. The Ninth Circuit held that "an employer may be held liable for sexual harassment on the part of a private individual, such as the casino patron, where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective action when it knew or should have known of the conduct." Id. at 756. The court affirmed the district court's grant of summary judgment against the plaintiff, however, concluding that the mime failed to present any facts demonstrating that the casino ratified or acquiesced in the harassment. Id.[4]

_____

[4] See also Menchaca v. Rose Records, Inc., No. 94 C 1376, 1995 WL 151847, at *3 (Apr. 3, 1995 N.D. Ill.) ("harasser's status as a non-employee does not as a matter of law shield the employer from liability under Title VII, if the
(continued...)

We agree with our sister circuits that an employer may be found liable for the harassing conduct of its customers. The focus of the inquiry in a hostile work environment claim, as the name suggests, is on whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'" Harris, 510 U.S. at 21 (quoting Meritor, 477 U.S. at 65). An employer who condones or tolerates the creation of such an environment should be held liable regardless of whether the environment was created by a co-employee or a nonemployee, since the employer ultimately controls the conditions of the work environment.

Moreover, we agree with those courts that have applied a negligence theory of liability to the harassing acts of customers. In cases involving harassment by co-workers, as opposed to harassment perpetrated by supervisory employees, the only basis for employer liability available is a negligence theory under Restatement (Second) of Agency § 219(2)(b). See Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 577 (10th Cir. 1990); see also 29 C.F.R. § 1604.11(d) (1997); Burlington Indus., Inc., 118 S. Ct. at 2268; Adler v. Wal-Mart

---

[4](...continued)
employer knew or should have known of the harassment"); Powell v. Las Vegas Hilton Corp., 841 F. Supp. 1024, 1028 (D. Nev. 1992) ("in the appropriate case, an employer could be liable for the sexual harassment of employees by nonemployees, including its customers"); EEOC v. Sage Realty Corp., 507 F. Supp. 599 (S.D.N.Y. 1981) (Title VII violated where employer required female lobby attendant to wear very revealing "Bicentennial uniform" when the employer knew wearing the uniform would subject her to sexual harassment by building tenants and strangers).

Stores, Inc., 144 F.3d 664, 683 (10th Cir. 1998) (Briscoe, J., dissenting).  Because

harassment by customers is more analogous to harassment by co-workers than by

supervisors, we hold the same standard of liability applies to both co-worker and

customer harassment.  Thus, employers may be held liable in these circumstances

if they "fail[ ] to remedy or prevent a hostile or offensive work environment of

which management-level employees knew, or in the exercise of reasonable care

should have known."  Hirschfeld, 916 F.2d at 577 (internal quotation omitted).

Ms. Lockard testified she had informed Mr. Jack before November 6 that

she felt uncomfortable waiting on these men.  On the night of November 6, before

Ms. Lockard seated these customers, she again stated to Mr. Jack that she did not

want to serve them.  Ms. Lockard further testified that Mr. Jack knew the

customers were the same men she had complained about previously.  Without any

further inquiry as to why Ms. Lockard felt uncomfortable,[5] Mr. Jack instructed her

---

[5] Pizza Hut's policy manual on harassment for management employees
includes hypothetical scenarios and suggested solutions illustrating appropriate
manager responses in these situations.  In one scenario, a female employee is
subjected to sexual harassment by a co-worker and asks the assistant manager for
a transfer, informing him that she does not feel comfortable working with her co-
worker.  The female employee, however, does not specifically tell her manager
about the incidents of harassment.  The policy manual instructs the assistant
manager to ask the female employee why she felt uncomfortable.  The manual
states that "[t]he company was put on notice that there was a situation in the unit
where one employee no longer felt comfortable working with another employee.
This knowledge should prompt additional questions to find out if sexual
harassment is the problem."  Aplt. App. at 560.  The assistant manager is directed
to share this conversation with the unit manager, and the unit manager is directed

(continued...)

to wait on their table. After Ms. Lockard seated them, one of the men grabbed her hair. Ms. Lockard reported the hair-pulling incident to Mr. Jack and asked that another waiter serve the men. Mr. Jack refused her request and instructed Ms. Lockard to continue to wait on them. Following Mr. Jack's orders, Ms. Lockard returned and was sexually assaulted.

As the shift manager, Mr. Jack clearly had authority over Ms. Lockard and her co-workers; he ordered Ms. Lockard to wait on the two offensive customers despite Ms. Lockard's requests that he ask another waiter to do so. Moreover, Mr. Jack testified that he was the acting manager of the Atoka Pizza Hut when Ms. Selby, the Unit Manager, was not present at the restaurant. Under Pizza Hut's policy manual on sexual harassment, which instructs managers on the steps they should take once they become aware of customers who harass employees, managers are specifically authorized to "ask[] the customer to refrain from the conduct and if the customer persists, ask[] the customer to leave the restaurant." Aplt. App. at 557. Mr. Jack thus had control over the working environment at the Atoka Pizza Hut and "the ability to alter those conditions to a substantial degree." Crist, 122 F.3d at 1112. Mr. Jack therefore was a management-level employee for our purposes. See Adler, 144 F.3d at 674 ("low-level supervisor" was "management-level employee" because he was titled supervisor, had "some

---

[5](...continued)
to contact the Human Resource Manager and initiate an investigation.

authority" over plaintiff and her co-workers, and reported to manager who had authority to hire, fire, and formally discipline employees).

Prior to the sexual assault, Ms. Lockard had informed Mr. Jack of the hair-pulling incident and had also told him on three occasions that she did not wish to serve these customers. We hold that this information was sufficient to place Mr. Jack on notice that these customers were likely to sexually harass Ms. Lockard. Accordingly, once Ms. Lockard reported this information to Mr. Jack, A&M's obligation to respond adequately and promptly was triggered.[6] Mr. Jack clearly

_____

[6] We have also
       imputed an employee's knowledge of sexual misconduct
       to an employer, regardless of whether an employee is
       management, where company policy specifically
       designates that employee as the proper person to receive
       and discuss complaints of sexual harassment. See, e.g.,
       Hirase-Doi [v. U.S. Communications, Inc.], 61 F.3d
       [777,] 784-85 [(10th Cir. 1995)] (report of harassment to
       union vice-president constituted notice to employer
       where employee policy manual provided that employees
       could discuss problems of sexual discrimination with
       union vice-president); Baker v. Weyerhaeuser Co., 903
       F.2d 1342, 1345 (10th Cir.1990) (employer had notice of
       harassment once plaintiff reported incident to immediate
       supervisors who under company policy were required to
       pass on information to "upstairs management").
Jeffries v. State of Kansas, No. 96-3381, 1998 WL 318533, at *7 n.7 (10th Cir. June 17, 1998). The sexual harassment policy at Pizza Hut first instructs a harassed employee to speak with her manager or immediate supervisor, in this case Mr. Jack. Once a manager becomes aware of an incident of harassment, he is responsible for informing the appropriate higher officials "whether or not the victim requests that management become involved." Aplt. App. at 562. When Ms. Lockard, in accordance with Pizza Hut's policy, informed Mr. Jack that a

(continued...)

did not respond adequately to Ms. Lockard's complaint. Instead of following the guidelines set forth in Pizza Hut's policy manual, Mr. Jack ordered Ms. Lockard to continue waiting on the two customers, despite their display of physically aggressive sexual behavior. Mr. Jack placed Ms. Lockard in an abusive and potentially dangerous situation, although he clearly had both the means and the authority to avoid doing so by directing a male waiter to serve these men, waiting on them himself, or asking them to leave the restaurant. Ms. Lockard, under the instruction of Mr. Jack, returned to their table and was again subjected to sexually abusive conduct. Because Mr. Jack had notice of the customers' harassing conduct and failed to remedy or prevent the hostile work environment, A&M is liable for Mr. Jack's failure.

### III

Defendants next contend that the district court erred in denying their motion for a new trial or in the alternative for a remittitur, erred in admitting testimony concerning Mr. Jack's homosexuality and the rebuttal testimony of Ms. Lockard's co-worker Mona Harrison, and erred in awarding Ms. Lockard $1514.21 in costs. We review all three decisions under an abuse of discretion

---

[6](...continued)
customer had grabbed her by the hair, this knowledge was imputed to the company.

standard,[7] and address each argument in turn.

**A**

The jury awarded Ms. Lockard $200,000 in compensatory damages. Ms. Lockard and several family members testified that she had been sexually abused as a teenager. She therefore had a pre-existing condition which was aggravated by the incident of harassment she suffered while working at the Atoka Pizza Hut. For two years after the incident, she was unable to go out in public and was fearful of being around men, including male family members. Ms. Lockard received psychological counseling and was diagnosed with post-traumatic stress syndrome and depression. She testified that she remained frightened of men, and that at her new job she requested that she care only for female patients. In view of the emotional injury suffered by Ms. Lockard as a result of the incident, the district court did not abuse its discretion by declining to reduce the verdict or grant a new trial. The verdict was not so excessive as to "shock[ ] the judicial conscience and raise[ ] an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." Fitzgerald v. Mountain States Tel. & Tel. Co., 68 F.3d 1257, 1261 (10th Cir. 1995).

---

[7] See Malloy v. Monahan, 73 F.3d 1012, 1017 (10th Cir. 1996) (excessiveness of verdict); Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995) (admission of evidence); United States v. Allemand, 34 F.3d 923, 929 (10th Cir. 1994) (witness testimony); Riggs v. Scrivner, Inc., 927 F.2d 1146, 1149 (10th Cir. 1991) (costs).

**B**

Defendants made a motion in limine requesting that the district court exclude all evidence concerning Mr. Jack's homosexuality. The court denied the motion, finding Mr. Jack's homosexuality relevant to his attitude toward sexual harassment and his inattention to Ms. Lockard's complaints. In his opening statement, Ms. Lockard's attorney pointed to Mr. Jack's homosexuality as an explanation for his insensitivity to Ms. Lockard's complaints of harassment by the two male customers. Defendants did not object. The only other reference to Mr. Jack's homosexuality occurred during Mr. Jack's cross-examination when Ms. Lockard's attorney questioned him about any discussions he might have had with Pizza Hut employees regarding his sexual preference. Defendants objected on the basis of relevance, and the court sustained the objection.

The suggestion that Mr. Jack's homosexuality would make him less sensitive to Ms. Lockard's complaints seems to us little more than an attempt to further an unfounded stereotype. Moreover, the unfair prejudice that necessarily accompanies such evidence mandates its exclusion. See Cohn v. Papke, 655 F.2d 191, 194 (9th Cir. 1981). However, we are not persuaded that these two very limited references to Mr. Jack's homosexuality were sufficiently prejudicial to warrant a new trial.

With regard to the admission of the rebuttal testimony of Ms. Harrison, Ms.

Lockard offered the court specific examples of the way in which Ms. Harrison's testimony would rebut the testimony of defendants' witnesses. The district court clearly did not abuse its discretion by allowing it.

## C

We reject out of hand defendants' argument that the magnitude of Ms. Lockard's verdict precludes the district court from awarding her costs. We also find meritless defendants' contention that because Ms. Lockard's family members would have attended the trial anyway the district court erred in awarding her the costs associated with the attendance of those family members who testified, and defendants' assertion that because Ms. Harrison ultimately was not able to testify in person,[8] the court erred in awarding the costs associated with her attendance at trial. The district court acted within its discretion in awarding costs to Ms. Lockard.

## IV

In a separate appeal, defendants maintain the district court erred in awarding Ms. Lockard $37,088 in attorneys' fees. We review for an abuse of discretion. See Mann v. Reynolds, 46 F.3d 1055, 1062 (10th Cir. 1995).

Defendants first contend Ms. Lockard was precluded from receiving any attorneys' fees. Title VII provides that a successful plaintiff is entitled to recover

---

[8] Because Ms. Harrison was unable to testify in person as a result of trial delays and a personal conflict, her deposition testimony was read into the record.

attorneys' fees except in "unusual circumstances." 42 U.S.C. § 2000e-5(k). The only circumstance to which defendants point is the size of the verdict. We have already held that the verdict amount is supported by the evidence and we therefore doubt that its size could be considered an unusual circumstance within the meaning of section 2000e-5(k). Moreover, defendants cite no authority for their assertion that where a plaintiff receives an award that is allegedly disproportionately high the court need not grant attorneys' fees. The district court did not abuse its discretion in awarding Ms. Lockard attorneys' fees.

Defendants next contest the amount of fees awarded to Ms. Lockard. Two attorneys worked on Ms. Lockard's case. The primary attorney sought compensation for 227.77 hours for attorney time and 9.85 hours for travel time. The second attorney, who joined Ms. Lockard's case a month before trial, sought compensation for 60.2 hours attorney time and 12 hours travel time. Both attorneys requested an hourly rate of $150 for legal services and of $100 for travel time. Defendants' experts testified that $100 would be a reasonable hourly rate for a case like Ms. Lockard's in Muskogee, Oklahoma, while Ms. Lockard's experts testified to the reasonableness of $150. The trial lasted two-and-a-half days and involved ten witnesses. Counsel conducted numerous pre-trial depositions and defendants filed a motion in limine, an objection to the bill of costs, and a motion for judgment as a matter of law. The district court set the

hourly rate at $125 for legal services and $50 for travel time, but did not reduce the hours of either attorney.

Defendants contend the court should have reduced the hours because Ms. Lockard's case was not so complicated as to require two attorneys, and therefore the total number of hours included duplicated effort. Defendants further contend the hours should have been reduced because Ms. Lockard's attorneys block-billed their time and failed to maintain precise time records. Defendants do not argue that the total time spent by Ms. Lockard's attorneys was inordinate. We note that "[t]ime spent by two attorneys on the same general task is not . . . per se duplicative. Careful preparation often requires collaboration and rehearsal . . . ." Rodriguez-Hernandez, 132 F.3d at 860. Our review of the record convinces us that the district court did not abuse its discretion in setting either the rates or the number of hours used to calculate Ms. Lockard's award of attorneys' fees.

## V

In sum, we hold that Ms. Lockard failed to establish that Pizza Hut, Inc. is an employer under Title VII. We further hold that the evidence is sufficient to sustain the jury's verdict against A&M on the hostile work environment sexual harassment claim, and that the district court did not abuse its discretion on the evidentiary or excessive verdict issues or in awarding Ms. Lockard costs and attorneys' fees.

We **REVERSE** the judgment against Pizza Hut, Inc. and **AFFIRM** the judgment in all respects against A&M.