**Johnny PAPIN, Plaintiff,**

v.

**Kelly LOTTON, Willowbend Development Corporation of Wichita, and Club Corporation of America, Defendants.**

**No. 98–1341.**

United States District Court, D. Kansas.

Oct. 7, 1999.

Clark R. Nelson, Dennis V. Lacey, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for Plaintiff.

Gerald L. Green, Mark R. Maloney, Gilliland & Hayes, P.A., Wichita, KS, for Defendants.

## MEMORANDUM ORDER

MARTEN, District Judge.

This matter involves a claim of racial discrimination arising from the plaintiff Johnny Papin's employment at Willowbend Country Club. Papin has brought claims for racial harassment, retaliation, outrage and breach of contract against Willowbend, its director Kelly Lotton, and its parent company Club Corporation of America (CCA). Assuming Papin's assertions are true, Lotton repeatedly engaged in making racially-oriented derogatory comments, including the use of the worst racial language, in his presence. However, the court finds that, for the reasons cited herein, the court must grant summary judgment as to certain claims advanced by Papin. The remaining state law claims of the plaintiff will be dismissed without prejudice.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Defendant CCA is a Texas corporation, providing consulting and other service work to golf, business, and sports clubs. It also owns stock in affiliates which own, manage, and lease such clubs. Its principal place of business is Dallas, Texas. One of its wholly owned subsidiaries is Willowbend, which owns and operates Willowbend Golf and Country Club. Willowbend is a separate, Kansas corporation with its

principal place of business in Wichita, Kansas. Willowbend has its own employees, assets, debt, employers identification number, articles of incorporation, corporate by-laws, and directors.

Under an October 17, 1994 Consulting Agreement, CCA undertook to provide consulting services and advice. The Agreement provides:

> The parties acknowledge that CCA is only providing advice and counsel to the Corporation under the terms of this Consulting Agreement and CCA does not in any manner have the authority or responsibility to make or implement any final decision concerning the development and management of the Club. Subject to the approval rights, terms, and conditions of this Consulting Agreement, the Corporation has the ultimate responsibility for all decisions made concerning the Club.

Def. Exh. 1, at 3, ¶ 4.

The plaintiff disputes evidence showing that CCA acted in effect as an independent contractor and argues that CCA effectively controlled Willowbend. However, the evidence cited by plaintiff falls far short of this contention, and fails to controvert the evidence provided by CCA. For example, plaintiff stresses in particular the fact that the employee rule book used by Willowbend employees was copyrighted by CCA. But this is entirely consistent with the terms of the Consulting Agreement, under which CCA would provide advice and counsel to Willowbend. There is no evidence that the rule book was ever enforced by CCA, or that CCA even had the right to enforce any of the rules. In fact, other than the copyright statement, CCA is never identified in the rule book. The plaintiff's evidence does not controvert the direct statement by Jack Lupton, the Senior Vice President of CCA, that the Texas corporation had no power to "make or implement any final decisions concerning the development and management of Willowbend's business or decisions concerning employees." (Def. Exh. A, at 2, ¶ 7).

Plaintiff also cites the fact that, according to one Willowbend employee, Earl Wohlgemuth, CCA had written checks to him, and that CCA personnel were listed next to a telephone at Willowbend as "points of contact." Again, the evidence is not inconsistent with the evidence showing CCA did not control the day-to-day operations of Willowbend. Finally, plaintiff cites a portion of defendant Lotton's deposition which plaintiff contends demonstrates that Lotton was under the control of Lupton. In fact, Lotton's deposition statement is not inconsistent with the other evidence that CCA provided general counseling and advice. Lotton does not state that Lupton or any other CCA personnel had direct authority to make employment decisions regarding Willowbend employees.

Finally, Papin notes that Lupton, in addition to being the Senior Vice President for CCA, was also on the board of directors for Willowbend. But there is no evidence that Lupton, while he may have been on the board at Willowbend, ever actively involved himself in the management of the Wichita club.

Defendant Kelly Lotton is Willowbend's head golf professional and club manager. Papin went to work for Willowbend in June, 1993. At that time, Lotton was the head golf professional and Dave Fouse was the general club manager. Fouse made the decision to hire Papin. The power to hire and fire Papin belonged to the Willowbend general club manager. Lotton became the club manager in July, 1995.

While Fouse was the manager, Papin had contact with him on a regular basis, at least once a week, and Fouse helped him in learning to play the guitar. Papin never told Fouse about the harassment or treatment he was receiving from Lotton.

Papin worked for Willowbend as the locker room attendant and did general cleaning from June to November of 1993, from March, 1994 to June, 1995, and from March, 1996 to February 17, 1997. On two occasions before his final resignation,

Papin voluntarily left or quit his employment at Willowbend. Each time he quit and returned to work, Papin did not tell Lotton why he had quit or that he wanted the harassment to stop.

Papin knew he worked for Willowbend. He did not know anything of CCA's existence until after his termination.

Papin has stated that, while he was employed at Willowbend, Lotton made comments which were racial in nature. The first thing Papin noticed, at a time when "there was a lot of gang things going on in the news, and you know, the gangs were shooting each other," Lotton began to act "like he was from the hood ... talking real slangish and [making] gestures, you know, how you see the gang bangers do and flipping signs at you." (Papin dep. at 101–02). Papin first thought this was "almost amusing," but Lotton continued to make racial comments. (Id. at 102–03). He made gestures indicating gang signs, and ordered food using exaggerated dialect (Id. at 117, 190).

Lotton twice used the word "nigger." (Id. at 189). Once, while sitting in the clubhouse, Lotton entered and said, "I hate niggers, I hate niggers." (Id. at 122). According to Papin, Lotton "just let that hang," and then asked "Did you all see Chris Rock last night?" and proceeded to relate part of Rock's routine on an HBO special. Papin had seen the special the night before,[1] but felt the comment was directed at him—the only black person in the room.

On the other occasion, one Sunday morning, as Papin and Lotton were playing in a foursome, Papin got ready to hit his ball and, as he "kind of tend[s] to ... move around" preparing, (Id. at 107), Lotton asked him, "Whatcha jumping around like a nigger with some ants in your pants for?" (Id. at 108).

On other occasions, Lotton told Papin to "get your black ass out of my way." (Id. at 107). On another occasion, Lotton was throwing a Nerf football around. When the ball hit Papin in the back of the head, Lotton said "Got your black ass that time, didn't I?" (Id. at 94). When Papin was playing a match with a woman, Lotton told him at one point, "Your black ass is going to miss the whole ball," and later taunted him that "She's going to beat your black ass." (Id. at 80).

These are the specific comments that Papin can remember. (Id. at 193). He has stated that there were at least four incidents of harassment each week. (Id. at 121).

Conspicuously posted in the Willowbend offices, next to the time clock, was an 18 × 24 inch color poster which provided

## Private Employment, State and Local Governments, Educational Institutions

Applicants to and employees of most private employers, state and local governments, educational institutions, employment agencies, and labor organizations are protected under the following Federal laws.

### Race, Color, Religion, Sex, National Origin

Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in hiring, promotion, discharge, pay, fringe benefits, job training, classification, referral, and other aspects of employment, on the basis of race, color, religion, sex, or national origin.

(Def. Fact ¶ 30). In addition, there was an 8 × 10 inch sign regarding "Employee Partner Complaint Resolution Procedure," which provided that "If you feel you have a concern or problem that is not or cannot

---

1. According to Papin's deposition, the routine in the Chris Rock special continued in the following manner, with the comic stating "now let me clean this up—when I say I hate niggers, don't mean that I don't love black folks. A nigger will come to your house and steal while you're at your job, your TV and, you know, a black man will call neighborhood watch." (Papin dep. at 123).

be resolved with your direct supervisor or general manager please contact the following people," and provided the names, addresses and telephone numbers of two CCA officers. (Id.).

The Employee Handbook given to Willowbend employees, including Papin, provides:

> As an equal opportunity employer, the club will always endeavor to select the best qualified individuals based on job-related qualifications, regardless of factors such as race, sex, creed, color, religion, national origin, age, marital status, sexual orientation, physical or mental disabilities, or status as disabled or Vietnam-era veteran, when the individual is otherwise qualified. This policy commits the club to provide equal employment opportunity in all phases of employment including, but not limited to recruitment, selection, placement, transfers, training and development, promotions, demotions, compensation, benefits, layoffs and terminations and all conditions or privileges of employment.

(Def. Exh. 2, at 4). The handbook provides a three step complaint procedure, ascending from the employee's immediate supervisor, to the club manager, to the regional manager. The handbook acknowledges that "[t]here may be times, of course, when you can't talk to your supervisor; for example, if your supervisor is part of the problem you need to discuss. In those cases, you should go directly to the next step." (Id. at 10).

Papin contends that he undertook additional duties in the course of his employment, based upon Lotton's promise to give him a raise to $8.00 per hour. In October of 1996, Papin volunteered to undertake the additional duties without any discussion of a change in his pay. Sometime afterwards, Papin asked Lotton for a raise. Lotton told Papin that he would get him a raise. He indicated he was going to get a raise of around a dollar and a half. (Papin

dep. at 66). Papin received a 13% pay raise, an additional $0.75 per hour, on January 13, 1997.

Papin never told Lotton that he did not like or appreciate his behavior. He did turn and leave when Lotton harassed him. Papin never told any of Lotton's superiors about the alleged harassment. He never invoked or tried to utilize the policies described in the handbook or signs posted in the clubhouse. He never complained about Lotton to Willowbend management.[2] He never reported any alleged racial harassment to CCA. He did, however, attempt to contact Lotton's superior about getting his pay raise.

On February 17, 1997, Papin went to speak with Lotton, who was talking to another employee. Eventually, Lotton turned to Papin and asked "What you want now with your stupid ass?" (Papin dep. at 147).

> He didn't even say good morning to me. I'd been there since 5:00 o'clock in the morning. It's 10:00 something now. He ain't said nothing and the first thing he says, What you want now with your stupid ass? I said Kelly, hold it man. He says, Kelly, well, hold it, man, hold it, man. I did all but kick his ass right then and there. I said, fuck this, I quit. No, I mean I didn't say I quit, I just said Fuck it, and I just turned around and walked off.

(Id. at 148–49).

Based on the affidavits of Lupton and Lotton, the defendants contend plaintiff has failed to demonstrate that Papin quit his job because of any racial harassment. Papin responds to this fact, however, by merely citing the passage from his deposition quoted immediately above. (Resp. at ¶ 43). He does not respond by presenting any affidavit or other evidence suggesting he quit because the racial harassment became intolerable.

---

**2.** Papin did tell a fellow employee, Earl Wohlgemuth, about the alleged harassment. Wohlgemuth told Papin that the employee

handbook contained provisions relating to racial discrimination and harassment. (Papin dep. at 100).

Lupton and Lotton deny in their affidavits that the defendants engaged in any retaliatory conduct against Papin. Papin states that he began to receive harassing and threatening telephone calls about eight to ten days after he quit. They stopped when Papin called Lotton's house, spoke with his wife, and told her "if it's going to be any more phone calling I'm going to make some phone calls." (Papin dep. at 178).

### Conclusions of Law

The court will grant summary judgment as to claims of discrimination, racial harassment and retaliation. The remaining state claim will be dismissed without prejudice.

■ The defendant CCA is entitled to summary judgment. The present matter is very similar to that presented in *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1070 (10th Cir.1998). There, the court concluded that it was possible to hold a parent corporation liable for the discriminatory acts suffered by the employee of a subsidiary, but only where the parent company actively involved itself in the day to day activities of the subsidiary. Here, the actions of CCA are no more extensive that those of Pizza Hut in *Lockard*, where the court held that the parent company could not be held responsible for the alleged discrimination.

Similarly, the court finds that Lotton should be dismissed from the Title VII and KAAD claims, pursuant to *Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir.1993), as Papin all but essentially concedes. As the defendants essentially concede, Lotton is a proper party to the § 1981 claim.

As to the merits of the harassment claim itself, the defendants argue both that the environment experienced by Papin was not materially harassing, and that they are entitled to the affirmative defense recognized in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industr. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). It is true that Papin endured the alleged harassment, never

complained of it, and finally quit as the result of an incident in which Lotton was rude but not racist (making the comment "What you want now with your stupid ass?"). On the other hand, assuming Papin's characterizations of Lotton's earlier comments are correct, he was previously subjected to a steady stream of racist comments which the court finds presents a colorable claim of illegal racial harassment. The court finds that Papin has provided evidence of a colorable case of racial harassment.

■ However, the court finds defendants Lotton and Willowbend are be entitled to the affirmative defense, based upon the showing that there were procedures in place for Papin to obtain relief from the alleged harassment, and that Papin unreasonably failed to use them. In his response, Papin makes three arguments: (1) that the affirmative defense is unavailable at a threshold level, since he suffered a tangible employment action (not getting his raise); (2) the defense is invalid because the procedures were not adequate, and (3) Papin's failure to use them was not unreasonable.

Each of these arguments is without merit. As to the first, the plaintiff correctly notes that the affirmative defense is unavailable under *Faragher* and *Ellerth* if the plaintiff has suffered a significant change in employment responsibilities as the result of harassment by a supervisor. However, the defendants correctly observe that throughout the present case Papin has consistently presented the failure to get his raise as a separate, contract related matter. Prior to his response to the summary judgment motion, Papin has never argued or suggested the denial of the pay raise was the product of racial discrimination or harassment. Moreover, even now, plaintiff has not provided the slightest degree of proof that the pay raise was withheld for racial reasons. As a result, the court will proceed to determining whether the affirmative defense is applicable to the present case.

Papin argues the harassment policy at Willowbend was inadequate. However, Papin makes no attempt to explain why or how the policy was inadequate, he offers no proof why it was inadequate: he merely points out that the policy on sexual harassment is much more lengthy than that against racial discrimination and harassment. That hardly shows that the racial policy is inadequate. Papin also argues[3] that his failure to use the policy was not unreasonable, since he did not know about it. In light of the facts before the court, this is false in two respects. As noted earlier, Papin himself stated in his deposition that, when he told a co-worker about the harassment, the co-worker responded by telling Papin of the harassment policy in the employee handbook. Second, Papin knew about the grievance procedure and used it—to complain about not getting the pay raise he wanted.

The court will grant summary judgment in favor of the defendants as to the claims of race harassment, and holds that under the facts the plaintiff unreasonably failed to follow an established grievance procedure which would reasonably have remediated his complaints of discrimination.

Plaintiff Papin's other claims include retaliation, the tort of outrage and the contract claim. The retaliation claim is the more substantial. Here also the defendants make a general argument that the court cannot accept. Specifically, the defendants deny engaging in any retaliatory conduct against Papin, and argue that the perpetrators of the harassing calls have never been actually identified. However, assuming Papin's evidence is true that the calls started shortly after Papin left Willowbend and stopped shortly after he spoke with Lotton's wife, a reasonable fact finder could infer that Lotton was behind this conduct.

 However, this does not mean that a retaliation case is made out under federal law. A plaintiff presents a prima facie case of retaliation by presenting evidence showing that

(1) he engaged in protected opposition to statutorily prohibited discrimination; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with his protected opposition; and (3) a causal connection exists between the employer's adverse employment action and the employee's protected activity. *See Murray v. City of Sapulpa,* 45 F.3d 1417, 1420 (10th Cir. 1995); *Cole v. Ruidoso Mun. Sch.,* 43 F.3d 1373, 1381 (10th Cir.1994). Former employees qualify as "employees" for purposes of bringing unlawful retaliation claims against a former employer. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 849, 136 L.Ed.2d 808 (1997). *Trujillo v. University of Colorado Health Sci. Ctr.,* 157 F.3d 1211, 1215 (10th Cir. 1998). *See also Roberts v. Roadway Express, Inc.,* 149 F.3d 1098, 1103 (10th Cir. 1998). Adverse employment action means discharge, refusal to hire, demotion, refusal to promote or reprimand. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Retaliatory conduct other than discharge or refusal to hire is thus proscribed by Title VII only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him of an employment opportunity, or adversely affects his status as an employee. *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997). Adverse employment actions under § 1981 are broader, and may include discharges, demotions, refusals to hire or promote, and reprimands. *Pierce v. Texas Dep't of Criminal Justice,* 37 F.3d 1146, 1149 (5th Cir.1994).

 But under either provision, the alleged retaliatory conduct must center on, and somehow degrade, the employment or employability of the plaintiff. Here, Papin

---

**3.** To be precise, the response brief advances the matter as argument only: Papin does not himself submit any affidavit to this effect.

has alleged that, after he quit Willowbend and was no longer employed there, he received anonymous, harassing telephone calls. Once a car flashed its lights at him. There is, however, no evidence this alleged behavior inhibited Papin in any way from obtaining other employment. Indeed, the record suggests that Papin found employment with another country club approximately one week after he left Willowbend. There is no evidence that the harassment continued for any length of time, or that it in any way interfered with his new employment. The court will grant summary judgment as to plaintiff's retaliation claims.

The remaining claims against the defendants are the Count III outrage claim and the Count V contract claim. These claims are purely matters of state law. The plaintiff has never attempted to invoke diversity jurisdiction,[4] relying instead solely on federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367. Having dismissed all claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining claims. *See United Mine Workers v. Gibbs* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Under § 1367(c), when all the federal claims have been dismissed from the case, supplemental state claims will ordinarily be dismissed without prejudice. *Roe v. Cheyenne Mountain Conf. Resort,* 124 F.3d 1221, 1237 (10th Cir.1997); *Gullickson v. Southwest Airlines Pilots' Ass'n,* 87 F.3d 1176, 1187 (10th Cir.1996). The court accordingly will dismiss without prejudice the state law claims of the plaintiff.

IT IS ACCORDINGLY ORDERED this 7th day of October, 1999, that the defendants' motion for summary judgment (Dkt. No. 40) is granted in part and denied in part, as provided herein. The remaining state claims of the plaintiff are dismissed without prejudice.

---

4. Papin and Lotton are residents of Kansas. Papin has previously contended that Willowbend was a Texas corporation, with a principal place of business in Dallas Texas. (Am. Compl., at ¶ 4). However, in their motion for summary judgment, defendants submit as an uncontroverted fact that "Defendant Willowbend is a Kansas Corporation with its principal place of business in Wichita, Kansas." (Def. Br., at ¶ 2). Plaintiff concedes the fact as uncontroverted.