FILED
United States Court of Appeals
Tenth Circuit

June 24, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

FRANK DENETCLAW,
an individual,

      Plaintiff-Appellant,

v.

THOUTT BROTHERS CONCRETE
CONTRACTORS, INC.,

      Defendant-Appellee.

No. 07-1468
(D.C. No. 1:06-cv-618-WDM-MJW)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **McKAY**, and **BRISCOE**, Circuit Judges.

Frank Denetclaw appeals from the district court's order granting summary

judgment to Thoutt Brothers Concrete Contractors, Inc. (Thoutt Brothers) on his

complaint for employment discrimination and retaliation. We affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## BACKGROUND

Mr. Denetclaw is a Navajo male, born in 1951. From December 29, 1999 through April 12, 2005, he worked for Thoutt Brothers, first as a Traffic Control Supervisor, and later as a Barricade/Flagger Crewmember. In 2005, he filed two charges of discrimination against Thoutt Brothers with the Equal Employment Opportunity Commission (EEOC).

Mr. Denetclaw filed his first charge on February 15, 2005. In the charge, he asserted that on March 30, 2004, C.J. Thoutt gave him a letter of reprimand and suspended him for a week after a "younger female . . . falsely accused me of harassment." Aplt. App., Vol. I, at 51. He complained that Thoutt Brothers did not adequately investigate that incident or provide him with an opportunity to appeal from the reprimand and suspension. He further complained that C.J. Thoutt favored younger female employees over him.

Thoutt Brothers investigated the charge and provided a response to the EEOC. The EEOC closed its file and issued a right-to-sue letter to Mr. Denetclaw. He did not pursue judicial remedies.

Thoutt Brothers fired Mr. Denetclaw two months later, on April 12, 2005. He contends that his firing was motivated by discrimination and/or retaliation for filing his first EEOC charge. After he was fired, on May 10, 2005, Mr. Denetclaw filed a second discrimination charge with the EEOC. He checked the boxes provided on the form indicating he alleged discrimination based on

-2-

"RACE"; "SEX"; "AGE"; and "RETALIATION." *Id.* at 16. He averred that the earliest and latest date of discrimination were the same, April 12, 2005, the day he was fired. *Id.* He then provided the following particulars concerning the alleged discrimination:

> On approximately January 20, 2005 [sic], I filed [an] EEOC Charge . . . . After I filed the charge, management started to treat me a little better. I was given more opportunities to work over time. Management began greeting me in the mornings. Then suddenly on April 12, 2005, I was terminated for reasons unknown to me. When I asked for a Termination Letter, I was told that I would not be given one. I believe that I have been terminated in retaliation for filing a Charge of Discrimination against the company. *Also, during my employment, I have been subjected to a hostile work environment based upon my status as a Native American. I have been subjected to 'injun' remarks and on hot days, I have been told to do an Indian rain dance.*
>
> I believe that I have been retaliated against for the filing of a charge of discrimination and discriminated against due to my race, American Indian (Navajo), my sex, male, and my age, 53[.]

*Id.* (emphasis added).

After the EEOC mailed him a right-to-sue letter on his second charge, Mr. Denetclaw brought this action in district court, alleging that Thoutt Brothers had discriminated and/or retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634; and 42 U.S.C. § 1981. The district court granted Thoutt Brothers' motion for summary judgment on all his claims.

## ANALYSIS

### 1.  Standard of Review

"We review de novo the district court's summary judgment decision, applying the same standard as the district court."  *Butler v. Compton*, 482 F.3d 1277, 1278 (10th Cir. 2007).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We examine "the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party."  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006) (quotation omitted).  We may affirm on any basis supported by the record, even though not relied on by the district court.  *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1163 n.17 (10th Cir. 2004).

### 2.  Finality of District Court Order

Mr. Denetclaw first argues that the district court's order of summary judgment is not a final order for purposes of appeal because it failed to resolve his § 1981 claims.  *See* 28 U.S.C. § 1291 (stating courts of appeals have jurisdiction over "appeals from all final decisions of the district courts of the United States.").  He asserts that we should therefore "dismiss this [appeal] and remand the case to [the] District Court" for consideration of the unresolved claims.  Aplt. Br. at 11.

"A final decision is one that fully resolves all claims for relief." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1541 (10th Cir. 1996). Mr. Denetclaw's first and third causes of action contained claims for relief under § 1981 as well as other anti-discrimination statutes. The wording of the district court's order indicates that the order was intended to be dispositive of each of these claims, regardless of their statutory basis. *See* Aplt. App., Vol. II, at 324 ("I find that Plaintiff has failed to demonstrate that Defendant's proffered reasons for termination are pretextual. . . . Defendant's motion for summary judgment *with respect to the discriminatory discharge claim* is granted." (emphasis added)); *id.* at 320 ("I find that Plaintiff failed to exhaust his administrative remedies *with respect to the hostile work environment claim.* Accordingly, this Court does not have jurisdiction over Plaintiff's *claim of hostile work environment.*" (emphasis added)). The district court thus entered a final decision as to all claims. Our jurisdiction is therefore proper, and we move on to the merits of the appeal.

### 3. Hostile Work Environment Claim

The district court dismissed Mr. Denetclaw's claim for hostile work environment based on his failure to exhaust his administrative remedies. The exhaustion requirement, however, applies only to the extent the claim was based on Title VII. A claim under § 1981 does not require the filing of an EEOC charge. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975) ("[T]he

filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a § 1981 action.")

While the district court's reasoning was incorrect to the extent the claim was based on § 1981, we must consider it to the extent the claim was based on Title VII. "[A] plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue letter." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). A plaintiff's claims in federal court are generally limited to those that "can reasonably be expected to follow the charge of discrimination." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1187 (10th Cir. 2007) (quotation omitted). We are required to "liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." *Id.* at 1186.

Mr. Denetclaw's charge specified that he was complaining of hostile work environment discrimination based on his status as a Native American. It identified the particular actions he contended created a hostile work environment. Although he did not identify the individual alleged harasser or harassers, and the only time period he gave for the discrimination was "during my employment," Aplt. App., Vol. I, at 16, the hostile work environment claim he now pursues

-6-

could reasonably be expected to follow the allegations contained in his charge. He therefore exhausted his administrative remedies as to this claim.

As an alternate ground for a grant of summary judgment, Thoutt Brothers argued to the district court that the conduct alleged by Mr. Denetclaw did not constitute a hostile work environment. The district court did not reach this argument. Since we can affirm on any basis supported by the record, we will consider whether the summary judgment evidence revealed a genuine issue of material fact concerning the existence of a hostile work environment.

The elements of a hostile work environment claim are the same whether brought under Title VII or § 1981. *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1170 (10th Cir. 2008). We must determine whether:

> (1) the acts alleged by Mr. [Denetclaw] are part of the same hostile work environment and involve racial animus; (2) the harassment was sufficiently severe to alter the terms, conditions, or privileges of employment; and (3) whether [Thoutt Brothers'] response to the alleged harassment was inadequate.

*Id.*

Thoutt Brothers contends that summary judgment is appropriate because Mr. Denetclaw failed to show that the harassment was sufficiently severe to alter the terms, conditions, or privileges of his employment, and because he failed to show that the company provided an inadequate response to the alleged harassment. Because summary judgment is appropriate on the severity issue, we need not consider whether Thoutt Brothers provided an adequate response.

-7-

### A. Severity/Pervasiveness of Harassment

Thoutt Brothers accuses Mr. Denetclaw of misrepresenting and exaggerating the record and of creating sham issues of fact. We will therefore discuss in detail the record evidence concerning the alleged incidents.

### (1) "Rain Dance Requests"

Mr. Denetclaw testified at his deposition that he was asked to do "rain dances" on hot days. Aplt. App., Vol. I, at 74. He stated that concrete dispatch manager Carl Thoutt and a project supervisor named Marciano Bueno made these requests. *Id.* More precisely, Mr. Thoutt asked him to do a rain dance once, and Mr. Bueno "a couple times." *Id.* at 75. Construction workers, including "one guy called Savalla," also asked him to do rain dances. *Id.* Savalla only asked him "a few times." *Id.* at 76. In all, Mr. Denetclaw estimated that someone asked him to perform a rain dance "every day it got hot." *Id.* In his later affidavit, he specified that the requests to do rain dances "happened almost daily [between] June 2004 [and] August 2004 and in prior years about that time." *Id.*, Vol. II, at 202, ¶ 4. But he characterized these requests as "joking and kidding." *Id.* at 205, ¶ 32.

### (2) "Injun" Remarks

Mr. Denetclaw testified that Carl Thoutt invited him to look at his cell phone and see an "Injun running across the screen." *Id.*, Vol. I, at 73. This

happened "two or three times." *Id.* at 74. No other employees made "Injun" remarks. *Id.*

### (3)  Remarks About Hairstyle

At his deposition, when asked if employees used other racial slurs about him, Mr. Denetclaw stated that his co-workers "called me queer because I have my long hair." *Id.* He then stated that these remarks were "not racial," only "derogatory," and admitted they had nothing to do with his Native American heritage. *Id.*

By the time of his affidavit, however, he directly associated such remarks with racial discrimination. He stated:

> Marciano Bueno would call me queer when I wore my hair in braids. This was frequent. Bueno made the comment that all Indians are queer or faggots. The crew would laugh at the comment. No one else was treated like that.

*Id.*, Vol. II, at 202, ¶ 5.

In his brief, Mr. Denetclaw claims that "he frequently worked with his hair in braids because he was proud of his Native American heritage." Aplt. Br. at 18. He supports this contention with a record cite to the first page of his affidavit. The page cited, however, does not contain any statement about why Mr. Denetclaw wore his hair in braids.

### (4) Physical Assaults

In his affidavit, Mr. Denetclaw stated that "[o]n several occasions, Marciano Bueno grabbed me in my [crotch] area or on my buttocks. I broke away from him and told him I did not play that game." Aplt. App., Vol. II, at 203, ¶ 6. Although he claims in his brief that these acts occurred when he wore his hair in braids, *see* Aplt. Br. at 18, his affidavit does not indicate that this is the case. There is in fact no indication that these alleged assaults had anything to do with Mr. Denetclaw's being Native American.

### B. Application of Legal Standard

"[W]hether a hostile [work] environment claim is actionable depends not only on the number of incidents, but also on the severity of the incidents." *Tademy*, 520 F.3d at 1160. To survive summary judgment on such a claim, Mr. Denetclaw must show that his workplace "was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Id.* at 1161 (quotation and brackets omitted). A pervasively hostile work environment is not established "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious racial comments." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quotation omitted).

-10-

The incidents alleged by Mr. Denetclaw, taken as a whole, were neither sufficiently serious nor sufficiently pervasive to establish a hostile working environment. While the "rain dance" comments occurred frequently during the summer months, Mr. Denetclaw characterized them as joking and kidding. He cites no evidence that he regarded them as sufficiently serious to complain about them. Indeed, he did not mention them in his charge of February 15, 2005. The other "Injun" racial remarks were only isolated incidents, and not sufficiently serious or severe to create a hostile work environment.

Mr. Denetclaw admitted during his deposition that the remarks about his hairstyle were not racially related. He later attempted to tie them to his Native American heritage by describing in his affidavit an incident in which a co-worker allegedly made an offensive comment about Native Americans. He did not mention this incident during his deposition, however, even though he was asked about offensive comments. There is no indication that the evidence concerning the offensive comments was newly-discovered, or that his deposition testimony reflected a confusion that the affidavit sought to explain. His affidavit, which contradicts his deposition testimony, thus cannot be used to create a genuine issue of fact. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

There is no evidence that the "groping" incidents, while deplorable, were racially related. These incidents also made their first appearance in

-11-

Mr. Denetclaw's affidavit, being absent from his discrimination charges and his deposition testimony.

On balance, we conclude that summary judgment is appropriate on the hostile work environment claim because the evidence does not create a genuine issue of material fact concerning the existence of discriminatory intimidation, ridicule, or insult sufficiently severe or pervasive to alter the conditions of Mr. Denetclaw's employment and to create an abusive working environment.

**4. Retaliatory Termination Claim**

Mr. Denetclaw asserts that Thoutt Brothers fired him in retaliation for filing his first EEOC charge. The district court concluded that he failed to make out a prima facie case of retaliatory discharge. To establish a prima facie case, Mr. Denetclaw had to show "(1) [he] engaged in protected opposition to . . . discrimination; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008) (quotation omitted). The district court found that his evidence failed to establish the third element. The court reasoned there was no showing that the supervisor who terminated his employment, Christopher Brian Spahn, knew of the first EEOC complaint.

To establish the causal connection between filing his EEOC charge and his termination, Mr. Denetclaw must show that Mr. Spahn knew of his protected

activity when he fired him. *See Jones*, 502 F.3d at 1195. The record contains an affidavit signed by Mr. Spahn stating "I was unaware that Mr. Denetclaw had filed any EEOC charges until well after I terminated Mr. Denetclaw." Aplt. App., Vol. I, at 60, ¶ 9.

Mr. Denetclaw contends that a reasonable inference may be drawn that Mr. Spahn in fact knew of the EEOC charge when he terminated his employment. A party opposing summary judgment is of course entitled to all reasonable inferences to be drawn from the evidence. *Antonio*, 458 F.3d at 1181. But Mr. Denetclaw's argument on this point is not based on reasonable inferences; it is based on speculation.

Matthew Thoutt investigated and responded to the first EEOC charge on behalf of Thoutt Brothers. He examined the company's payroll records, then questioned company employees, including Mr. Spahn, in an oblique manner, to gather information while "not let[ting] them know why [he was] asking them the questions." Aplt. App., Vol. II, at 267. He stated he did this because "I didn't want [people] to know we have an EEO claim on file because I want to make sure that we get to the bottom of something. . . . I don't want them to have a bias in their head." *Id.* at 267-68.

Mr. Denetclaw argues, however, that Mr. Spahn had numerous opportunities to learn of the charge from Matthew Thoutt or others before he fired him. His theories are based primarily on what Mr. Spahn "could have heard" or

-13-

could have learned from Matthew Thout or C.J. Thoutt. *See* Aplt. Br. at 24-25. No proof is offered that Mr. Spahn did learn of the charge from others.

Only one of Mr. Denetclaw's theories, in fact, deserves further discussion. He claims that before Mr. Spahn took over supervision of the barricade crew from C.J. Thoutt and fired Mr. Denetclaw, C.J. Thoutt trained Mr. Spahn on operations for two weeks. C.J. Thoutt was a cousin of Matthew Thoutt. Although C.J. testified that he did not know about the charge before Mr. Spahn terminated Mr. Denetclaw, Mr. Denetclaw argues that it is plausible to believe that family member Matthew Thoutt would have told C.J. about the charge, which specifically named C.J. as a party guilty of discriminatory acts. He further argues that it is plausible that if the charge were pending during the period when C.J. trained Mr. Spahn, C.J. would have in turn told Mr. Spahn about the charge as part of his training.

The evidence from Mr. Denetclaw's own diary shows that the transition from C.J. to Mr. Spahn occurred at the latest on February 2, 2005, over two weeks *before* Mr. Denetclaw filed his first EEOC charge. It would have been impossible for C.J. to discuss a charge with Mr. Spahn when that charge had not yet been filed.

In sum, the record does not contain evidence to raise a genuine issue of material fact concerning whether Mr. Spahn was aware of Mr. Denetclaw's first charge of discrimination at the time he terminated Mr. Denetclaw's employment.

-14-

Mr. Denetclaw therefore failed to establish a prima facie case of retaliatory termination.

### 5. Discriminatory Termination Claim

Alternatively, Mr. Denetclaw alleged that Thoutt Brothers fired him as an act of discrimination based on his sex, race, and age. The parties do not dispute that he established a prima facie case of discriminatory discharge. Under the framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), the burden then shifted to Thoutt Brothers to articulate a legitimate, non-discriminatory reason for the termination. Thoutt Brothers supplied six such reasons. The burden then shifted back to Mr. Denetclaw to show that these reasons were merely a pretext for unlawful discrimination. The district court concluded that he failed to do so.

Mr. Denetclaw argues that he has shown that Thoutt Brothers' reasons are pretextual (i.e., unworthy of belief) in two ways: (1) by producing evidence that they are false, and (2) by establishing that Thoutt Brothers acted contrary to its own unwritten policies or practices by firing him. Before delving into the individual reasons and the evidence of pretext concerning them, we find it useful to discuss two general considerations involving pretext in this case.

First, Mr. Denetclaw argues that all of Thoutt Brothers' reasons are illegitimate, post-hoc fabrications because Mr. Spahn did not supply them to him at the time of his termination. In his deposition and his affidavit, Mr. Denetclaw

stated that Mr. Spahn refused to supply him with *any* reason for his termination at the time he fired him. Aplt. App., Vol. I, at 88; Vol. II, at 204. Thoutt Brothers admits that it provided no reasons *in writing*. *See id.* at 211, ¶ 6a. But Mr. Spahn stated in his affidavit that he did supply Mr. Denetclaw with a list of reasons, verbally. *Id.*, Vol. I, at 60, ¶ 7.

While this looks like a genuine factual dispute, it is not. Mr. Denetclaw's application for unemployment benefits directly and fatally undermines his assertions about lack of notice of the reasons for his termination. In a statement given to the Department of Labor on the same date that he was discharged, he stated that he and another worker named Juan Martinez "were called into a meeting on 4/12/05 and told that they were being discharged because a traffic control supervisor, Kimberly Oaker [sic], told [Mr. Denetclaw] that the job that was done on 4/8/05 [sic] . . . was done poorly and [he] and Juan showed up late." *Id.*, Vol. II, at 257. In a further statement in connection with his appeal from the denial of unemployment benefits, Mr. Denetclaw admitted to arguing with Mr. Spahn at the meeting about the reasons for his termination:

> Mr. Spahn stated at the meeting held April 12th that he was terminating me for working in <u>unsafe conditions</u>, a charge I challenged to prove was false [sic].
>
> [. . .]
>
> Mr. Spahn stated that I was late and that the set-up was wrong for work on Sat. April 9th in which I replied he was wrong, because I entered at 5:45 and left shop at 6:00 a.m.

-16-

*Id.*, Vol. I, at 136.

Thus, we must reject Mr. Denetclaw's argument that all of Thoutt Brothers' reasons for his termination were developed post hoc. The record does not support this contention. In fact it is flatly contradicted by the documentation generated in connection with his application for unemployment benefits. Moreover, the unemployment documentation does not indicate that the reasons Mr. Denetclaw cited to the Department of Labor were the *only* reasons he was given for the termination of his employment. This being the case, there is no record evidence to contradict Mr. Spahn's affidavit, in which he states that he provided Mr. Denetclaw with *several* reasons for termination at the time he fired him, including substantially all the reasons on which Thoutt Brothers now relies. *Id.* at 60.

A second general consideration arises because Mr. Denetclaw challenges the sufficiency of various individual reasons advanced by Thoutt Brothers as grounds for termination, arguing that many of the incidents could not have justified termination because Thoutt Brothers did not immediately terminate his employment when they were discovered. This ignores Thoutt Brothers' argument that it fired him due to cumulative dissatisfaction with his job performance based on multiple incidents of misconduct that occurred during a short period of time. Mr. Denetclaw supplies no evidence to contradict the cumulative nature of Thoutt Brothers' dissatisfaction with his numerous acts of misconduct.

It was Mr. Denetclaw's burden to demonstrate that *each* of Thoutt Brothers' reasons for terminating his employment was pretextual. *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000). Alternatively, he could avoid summary judgment if he managed to "cast substantial doubt on many of the employer's multiple reasons." *Id.* We turn now to the specific reasons for Mr. Denetclaw's dismissal to determine whether he met this burden.

## A. Falsification of Time Cards

The official workday at Thoutt Brothers began at 6:30 a.m. During the week of March 28, 2005 through April 1, 2005, Mr. Denetclaw was approved to come in and work early beginning at 6:00 a.m. on one day—Tuesday, March 29—because he had to pick up an item from the yard that was needed early at a work site. But he recorded a start time of 6:00 a.m. each day on his time card. When Mr. Spahn confronted him about the extra half-hours recorded on his time card for each of the other four days, Mr. Denetclaw initially stated he used the extra half hour each morning to load his truck with barricades. He did not have permission to log extra time to do this, however. He also stated that he had made an honest mistake on the time cards.

Mr. Spahn modified the time card to delete the extra half hour on each of the other four days. While Mr. Spahn was willing to correct Mr. Denetclaw's time card to fix the errors, Mr. Denetclaw fails to show that his willingness to do

so indicates that Thoutt Brothers could not later rely on the time card error as part of its justification for terminating his employment. Nor was Thoutt Brothers required to believe Mr. Denetclaw's explanation that he had made an honest mistake in reporting his hours.

### B. Failure to Set Up Barricades and Conduct Flagging (4/5/05)

Less than a week after the time-card incident, Mr. Spahn received a telephone call from a city inspector stating that the traffic control set-up was incorrect at a work site in Longmont, Colorado, and no traffic flagger was on duty. Traffic Control Supervisor Kimberly Olkjer arrived at the site and telephoned Mr. Spahn to notify him of the situation. During the telephone call, Mr. Denetclaw drove up to the work site. Thoutt Brothers contends that when Ms. Olkjer instructed him to correct the set-up and begin flagging, he responded by holding his hand up in her face and driving away, without complying with her instructions. Mr. Denetclaw denies that Ms. Olkjer instructed him to correct the set-up or that he put his hand in her face. Thus, there appears to be a factual dispute concerning Mr. Denetclaw's actions in response to Ms. Olkjer's directions.

But in listing his reasons for terminating Mr. Denetclaw's employment, Mr. Spahn emphasized Mr. Denetclaw's "insubordination in refusing to follow my orders" on that occasion. Aplt. App., Vol. I, at 60 (emphasis added). The parties agree that when Mr. Spahn subsequently contacted Mr. Denetclaw about the

-19-

reported problems at the Longmont work site, Mr. Denetclaw requested the name of the inspector who had complained. Mr. Spahn declined to provide that information. Mr. Denetclaw responded defiantly, telling Mr. Spahn to "quit harassing me about non-sense [sic] and to come out here and check it out instead of hearing complaints by Miss [Olkjer]." *Id.* at 136. Mr. Spahn considered Mr. Denetclaw's behavior during this incident insubordinate. Mr. Denetclaw fails to show that this impression of his behavior was pretextual.

### C. Tardiness, Early Departure, and Unsafe Conditions (4/9/05)

Mr. Denetclaw agreed to work overtime on Saturday, April 9, 2005. In his affidavit, he states that he told Ms. Olkjer that he could only work until noon that day because he had to pick up his mother from a nursing home. Although Thoutt Brothers claims he was assigned to work with the asphalt crew on Mountain View Avenue in Longmont, Mr. Denetclaw denies this. He states that he agreed to pick up barricades in a different part of Longmont.

When the asphalt crew foreman, Jorge Parra, arrived at the Mountain View work site at 7:00 a.m., no barricade or flagging personnel were there, and the traffic control barricades had not been set up. Mr. Parra set up some barricades himself and began flagging traffic for his crew.

The parties agree that Mr. Denetclaw arrived at the Mountain View work site later that morning. Mr. Parra claims Mr. Denetclaw and Mr. Martinez arrived at 8:30 a.m., set up a few barricades, and then left less than an hour later.

-20-

Mr. Denetclaw asserts that they actually arrived at 8:00 a.m. and set up barricades and traffic signs for lane closures. The parties agree that Mr. Denetclaw called Ms. Olkjer at 10:15 a.m. to report that he was picking up barricades at another location. He did not tell her that he had Mr. Martinez with him. As a result, Ms. Olkjer incorrectly assumed that Mr. Martinez was at the Mountain View site, flagging for the asphalt crew.

Longmont police later arrived at the Mountain View site and contacted a city inspector. At 10:45 a.m., the inspector called Ms. Olkjer to inform her that the traffic control setup was incorrect and that a certified flagger was not on duty. Ms. Olkjer called Mr. Denetclaw and ordered him to the work site to correct the set-up and begin flagging. He arrived at 11:00 a.m. and completed the setup. Thoutt Brothers claims that Mr. Denetclaw and Mr. Martinez then immediately left the work site for lunch and did not return until 12:15 p.m.[1]

Mr. Denetclaw claims he left the work site around noon because that was what he agreed to with Ms. Olkjer. Mr. Spahn testified that he made overtime assignments, not Ms. Olkjer, and that he was not made aware of any agreement that Mr. Denetclaw was allowed to leave early. Mr. Denetclaw further claims Mr. Martinez stayed at the site and flagged until 5:00 p.m. (Thoutt Brothers contends that Mr. Martinez left at 2:00 p.m.)

---

[1] Mr. Martinez stated in his affidavit that he took his lunch break when the crew took theirs.

Later that day, Ms. Olkjer drove by the work site where Mr. Denetclaw had been picking up barricades. She found that some of the barricades had been improperly stacked and left on a handicap ramp to the sidewalk. She called Mr. Denetclaw and claims that she told him he needed pre-authorization to take the afternoon off. She further claims she told him that the barricades on the handicap ramp needed to be loaded and all the barricades taken back to the rental company at the end of the day. Mr. Denetclaw denies that she told him these things or that he refused to obey her order to return the barricades. *Id.*, Vol. II, at 152, ¶ 8. The record reference he supplies does not support his contention that he did not disobey her order to return the barricades. *Id.* at 203-04, ¶¶ 8, 18. On the other hand, Mr. Spahn did state in his deposition that it was Juan Martinez and Richard Bueno who were responsible for returning the barricades. *Id.* at 189 (Spahn dep. at 115-16). He did not mention Mr. Denetclaw's responsibility for the barricades.

Mr. Denetclaw may thus have demonstrated some factual dispute about whether he left earlier than he was supposed to or failed to return barricades on April 9, 2005. His disagreement with Thoutt Brothers concerning his responsibilities on that occasion, however, is insufficient by itself to show that the decision to terminate his employment was pretextual, given that this was merely one incident out of many relied on by Mr. Spahn in its decision to terminate his employment.

### D. Failing to Follow Bad-Weather Policy (4/11/05)

Two days later, on Monday, April 11, 2005, there was a snowstorm. Both Mr. Spahn and Ms. Olkjer attempted to contact Mr. Denetclaw but were unable to reach him. Out of 300 Thoutt Brothers employees, only Mr. Denetclaw and Mr. Martinez showed up for work at company headquarters.

Mr. Denetclaw contacted Ms. Olkjer and told her that he was at the company equipment yard, but nobody was there. Ms. Olkjer informed him that the company was not working due to the snowstorm, and told him to go home. He responded that the company was required to pay him for showing up. Company personnel found a note from him the next day demanding that he be paid four hours' wages for showing up on April 11.

Thoutt Brothers asserts that neither Mr. Denetclaw nor Mr. Martinez called in before coming to work as required by the company's bad weather policy. Mr. Denetclaw denies that the policy required him to call in. But he does not deny that Mr. Spahn believed company policy required him to call in. *See id.* at 58.

Evidence showed that failing to call in or showing up without calling in on a snow day was ordinarily not grounds for discharge. *Id.* at 180. Thoutt Brothers viewed the incident more seriously, however, because Mr. Denetclaw insisted on being paid for his time when he did not call in and the company was not working

due to a snowstorm.  Thus, Mr. Denetclaw fails to show that reliance on this incident as part of the reason for terminating his employment was pretextual.

### E.  Insubordination to Ms. Olkjer

In the fall of 2004, Ms. Olkjer replaced Mr. Denetclaw as traffic control supervisor (TCS) after she passed a certification test and he did not.  Thoutt Brothers asserts that after she became a TCS, Mr. Denetclaw was insubordinate to Ms. Olkjer on a number of occasions.  He denies being insubordinate to her.  He also asserts that she did not have the right to supervise him and contends that disobedience to her orders therefore would not constitute insubordination.  There is some evidence that *as a general matter*, failure to follow the instructions of a TCS would not be considered insubordination.  *Id.* at 177-78 (C.U. Thoutt dep. at 64-65).  But Mr. Denetclaw admitted that during a meeting on March 2, 2005, Mr. Spahn explained to him "that [Ms.] Olkjer was his immediate supervisor and that he was required to follow her orders."  *Id.* at 150; *see also id.*, Vol. I, at 67.  He was also informed that failure to do so could result in his termination.  *Id.* at 68.[2]

Mr. Denetclaw has managed to create some issues of fact concerning particular incidents of insubordination to Ms. Olkjer on April 5 and April 9.  Even

---

[2]     Mr. Denetclaw's statement to the contrary in his affidavit, *see* Aplt. App., Vol. II, at 205, ¶ 38, is inconsistent with his prior deposition testimony and should be disregarded.  *Franks*, 796 F.2d at 1237.

if there is a genuine issue concerning whether he was actually insubordinate, however, he fails to demonstrate that Mr. Spahn's explanation that he believed Mr. Denetclaw had been insubordinate, taken in context with the plethora of other reasons on which Mr. Spahn relied in terminating his employment, was unworthy of belief.

### F.  Continuing Problems with Work and Safety Issues

Thoutt Brothers asserts that the incorrect barricade set-up on April 5, 2005, and April 9, 2005, which resulted in police involvement, were serious violations of its safety rules.  Although Mr. Denetclaw contends there was nothing wrong with the set-up, it is Thoutt Brothers' and the police department's opinion that counts on this question, not his.  Mr. Denetclaw points to C.J. Thoutt's testimony that setting up barricades incorrectly is ordinarily not a dischargeable offense.  *Id.* at 179-80 (C.J. Thoutt dep. at 71-74).  But this ignores Mr. Thoutt's statement that if police involvement becomes necessary because of a safety issue, improper arrangement of barricades is a much more serious issue.  *Id.* at 180 (C.J. Thoutt dep. at 73-74).

### G.  Thoutt Brothers' "Unwritten Policies"

Mr. Denetclaw also contends that Thoutt Brothers' reasons for termination are unworthy of belief because his supervisor Mr. Spahn behaved differently toward infractions of similarly-situated employees.  He notes that Richard Bueno did not show up for work on April 9, 2005, and failed to call Mr. Spahn, but

received only a verbal warning. He also notes that Mr. Spahn did not immediately terminate Mr. Martinez for showing up along with Mr. Denetclaw on the snow day on April 11, 2005.[3]

These arguments fail because Mr. Denetclaw has not shown that Mr. Bueno or Mr. Martinez were similarly situated to him. The evidence showed that Mr. Bueno missed work because his car broke down, and that he did call his immediate supervisor, Ms. Olkjer. *Id.* at 189 (Spahn dep. at 115). Mr. Martinez was fired at the same time as Mr. Denetclaw and there is no showing that he accumulated the number of violations of work rules in a short time period that Mr. Denetclaw did. These employees were not similarly situated to Mr. Denetclaw and he fails to show that they were treated differently based on an unwritten policy.

## CONCLUSION

The judgment of the district court is AFFIRMED.

Entered for the Court

Monroe G. McKay
Circuit Judge

---

[3] There was conflicting evidence concerning whether failure to follow the bad weather policy was a reason for Mr. Martinez's subsequent termination. *Compare* Aplt. App., Vol. II, at 193 (Spahn dep. at 141) *with id.*, Vol. I, at 98, ¶ 7.