ORDER AND JUDGMENT*
MICHAEL W. McCONNELL, Circuit Judge.
Renee Nettle, a former employee of the Oklahoma City Indian Clinic (“the Clinic”), alleges that she was repeatedly harassed at work and fired when she complained about it. She filed a civil rights suit against the Clinic. The Clinic was granted summary judgment on all claims. Ms. Nettle appeals, and we affirm the judgment of the district court.
I. Facts
Ms. Nettle is a one-half Caucasian and one-half Native American, a member of the Delaware/Caddo Tribes. She is light-skinned and sometimes mistaken for a Caucasian. Ms. Nettle testified that she was “[b]y far” the person with the “lightest skin color” in the family services, R. 238, and that “most people to look at me they don’t see me as Indian, identifiably Indian.” R. 243. Ms. Nettle worked for the Oklahoma City Indian Clinic (“the Clinic”), whose “primary function is to provide medical and other health-related services to Native Americans.” R. 11. The Clinic is part of the Indian Health Service (IHS), which is permitted by law to give a hiring preference for Native Americans. According to the Indian Health Service website:
The purpose of this hiring preference is to support Indian participation in self-government, to further the Government’s trust obligations to tribes, to encourage American Indians and Alaska Natives to pursue higher education, and to enhance the positive effect of having Indians administer matters that affect Indian tribal life. The preference is granted to Indians not as a racial group but as members of sovereign tribal entities. The legislative history of Indian Preference hiring law reflects Congress’ awareness that non-Indians would be at an employment disadvantage in the IHS and the BIA.
http://info.ihs.gov/Infrastructure/ Infrastructure7.pdf. Ms. Nettle worked for about eleven years (August 13, 1993 to December 31, 2003) as a Child Development Specialist in the Clinic’s Community Services Department. Dist. Ct. Op. 1. From January 1, 2004, until her termination in November of that year, her job title was Native American Youth Specialist. R. 11. As a Child Development Specialist, Ms. Nettle’s duties included working with and counseling Native American families and their children, although she was never licensed as a counselor. Dist. Ct. Op. 2. As Native American Youth Specialist, Ms. Nettle’s job was to “provide Health Promotion/Disease Prevention services directed towards American Indian youth” and she was responsible for “mental health, substance abuse and social work service issues[.]” Dist. Ct. Op. 2. During her time at the Clinic, Ms. Nettle received positive job evaluations, and was never subject to any disciplinary action. R. 12; R. 112-16. She had been called a “wonderful asset” to the Clinic. Dist. Ct. Op. 3.
The Chief Executive Officer at the Clinic was Terry Hunter, who is part Caucasian *917 and part Native American, with tribal membership in the Kiowa Tribe and with tribal affiliation in the Delaware Nation and the Caddo Tribe. Aple. Br. 6. His skin pigmentation is darker than Ms. Nettle’s. R. 12, 83, 163, 237-38. In her complaint before the district court, Ms. Nettle said that Mr. Hunter would make “frequent comments in the workplace about different Native American tribes whose skin colors were lighter or darker than other Native American tribes,” and suggested that some employees were too “white.” R. 26. Mr. Hunter also, according to Ms. Nettle, said of her that “she thinks she’s Indian, but we wonder” and “on other occasions” made “derogatory statements about the Delaware tribe ... [such as] that ‘they want to pretend and be like Indians of browner skin.’ ” R. 12; R. 154. Although she knew that some of the comments might have been in jest, she still found many of them offensive. R. 171.
Ms. Nettle also accused Robyn Sunday, the Clinic’s Chief Operating Officer, of making derisive comments about Ms. Nettle and her appearance, saying at one point that she wanted to fire “white Renee.” R. 13. And she asserts that patients in the Clinic would call her the “white doctor.” Aplt. Br. 37.
In addition to the comments directed at her, Ms. Nettle alleges that the Clinic “removed several activities for which [she] was responsible and gave them to other employees.” R. 168. The reason for this, she alleges, was because Mr. Hunter believed that her light skin and Caucasian appearance rendered her a poor representative for the Clinic in the Native American community. Aplt. Br. 5.
Ms. Nettle eventually filed a Charge of Discrimination with the Equal Employment Opportunity Commission (“EEOC”) on October 22, 2004. She checked off the boxes on the form indicating that she was claiming discrimination based on race, col- or, and age. The text of the charge read that “Mr. Hunter would make comments about different tribes, and about those whose skin is lighter or darker than others. I and other employees are treated differently because of our tribe or skin color.” R. 390. The document put March 10, 2004 as the earliest date discrimination took place and October 20 as the latest. Id. In March 2004, the Clinic had canceled youth activities of which Ms. Nettle was in charge. R. 163.
On November 1, Ms. Nettle was placed on “administrative leave pending an investigation” into two matters: a memo Ms. Nettle had written on October 27 denying responsibility for a break-in at the Clinic offices, and whether Ms. Nettle had counseled a patient after being directed not to. Dist. Ct. Op. 7. Despite having been placed on administrative leave, Ms. Nettle used a Clinic van that same day to deliver materials for a Clinic function. Id. Ms. Nettle testified that she had been instructed by her supervisor to go ahead and transport the materials. Aplt. Br. 9; R. 101.
In a letter dated November 1, 2004, Ms. Nettle was informed that she had been fired, effective November 1, 2004, for “misconduct,” including her continuation of “counseling patients after being given a directive to cease all individual counseling.” Dist. Ct. Op. 8. Ms. Nettle filed a second EEOC charge alleging that she had been terminated in retaliation for filing her first EEOC Charge. R. 14. The Notice of Discrimination the Clinic received for Ms. Nettle’s first charge was dated November 5, 2004, four days after the Clinic fired Ms. Nettle, suggesting that the termination could not have been in retaliation *918 for the charge. Dist Ct. Op. 9. Ms. Nettle, however, testified that she had filed her charge on October 22 and that an employee with the EEOC told her she would faxing her Charge to the Clinic “immediately” and “that day.” R. 274, 285.
Ms. Nettle filed suit against the Clinic in federal district court on November 4, 2005. R. 2. In her original complaint, she alleged race and color discrimination, claiming that the comments of Mr. Hunter and others created a hostile work environment. She also alleged that she was fired in retaliation for filing her first EEOC charge. R. 29, 30. Ms. Nettle did not plead age discrimination in her original complaint, although she had checked off the box in her EEOC Charge, and she eventually conceded it. R. 56, 191. She also later conceded her claim for race discrimination. R. 191, 394. But in her reply to the Clinic’s motion for summary judgment, Ms. Nettle asked the court to allow her to maintain a cause of action for discrimination based on national origin. R. 191.
The district court granted the Clinic’s motion for summary judgment. The district court held that (1) under the “totality of the circumstances,” no reasonable juror could find that the comments that were directed at Ms. Nettle created a hostile work environment, (2) Ms. Nettle did not make a prima facie showing that she had been treated adversely because of her skin color, and (3) there was no causal connection between Ms. Nettle’s filing her first EEOC charge and the Clinic’s decision to fire her, hence no retaliatory termination. Dist. Ct. Op. 15, 18, 21. The district court also held that her national origin claim was not administratively exhausted, because she did not “identify national origin as a basis for discrimination in her EEOC Charges of Discrimination.” Id. at 24.
Ms. Nettle appeals. We review the district court’s decision de novo, applying the same legal standard used by the district court, McKenzie v. Dovala, 242 F.3d 967, 969 (10th Cir.2001). Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. “When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party,” and the nonmovant is given “wide berth to prove a factual controversy exists.” Id,, (citations omitted).
II. Retaliatory Discharge
Ms. Nettle argues that the court erred in finding that she had not made a prima facie showing of retaliatory discharge. In her second filed EEOC Charge, Ms. Nettle said that she believed that she had been retaliated against “for complaining of protected activity in my ... charge still pending before the Commission.” R. 33. To prove a prima facie case for retaliation, Ms. Nettle must show that she engaged in protected activity, that the Clinic took a material “adverse action” against her, and that there was a causal connection between the protected activity and the adverse action. See Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1176 (10th Cir.2007). The district court noted that it was “undisputed” that filing an EEOC charge is protected activity, against which the Clinic could not have retaliated by firing Ms. Nettle. Dist. Ct. Op. 19. This leaves Ms. Nettle’s burden to show that there was a causal connection between the filing of the EEOC charge (the protected activity) and her termination (the adverse action).
The Clinic objected that Ms. Nettle could not show a causal connection, and *919 the district court agreed. Ms. Nettle filed her first Charge of Discrimination on October 22, 2004, and the Clinic fired her on November 1 of that same year. A causal connection between an employee’s protected activity and an employer’s adverse action “may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive,” such as when the protected conduct is “closely followed” by an adverse action. Burns v. United Telephone Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir.1982). But the Clinic maintains that it was not aware that Ms. Nettle had filed her Charge with the EEOC until November 4, so that it could not have fired her because of the charge, even if it fired her after she filed the charge. See Jones v. U.P.S., Inc., 502 F.3d 1176, 1195 (10th Cir.2007) (“Unless an employer knows that an employee is engaging in protected activity, it cannot retaliate against that employee because of the protected conduct. ...”), Williams v. Rice, 983 F.2d 177, 181 (10th Cir.1993) (“to establish a ‘causal connection,’ plaintiff must show that the individual who took adverse action against him knew of the employee’s protected activity”).
Ms. Nettle testified in her deposition that the person who “took her information” at the EEOC, Carrie Hill, indicated that she was going to fax her charge to the Clinic “that day” and “follow[ ] up by mail.” R. 284-85. Although Ms. Nettle conceded in her deposition that she had no first-hand knowledge that the Clinic received her charge prior to her termination, she says she called Ms. Hill later in the day of October 22 and Ms. Hill told her “she had faxed it,” meaning the charge. R. 285; Aplt. Br. 24-25.
This is not enough to create a genuine dispute of fact. A court on summary judgment can accept evidence only when it would be admissible if offered in court. Adams v. Am. Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir.2000) (“Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment^]”). Ms. Nettle’s testimony that Ms. Hill told her that she (Hill) had faxed the charge on October 22 is inadmissible hearsay. Ms. Nettle could have obtained testimony from Ms. Hill directly, but did not. Accordingly, there is no admissible evidence in the record showing that the Clinic received the charge prior to Ms. Nettle’s termination on November 1.
Alternatively, Ms. Nettle argues that the “protected activity” that caused her firing was more than simply her filing of an EEOC charge. Appellant’s Br. 15. The district court held that Ms. Nettle’s retaliation charge “did not complain that she was retaliated against because she voiced informal complaints to superiors or co-workers, because she disagreed with her placement on administrative leave or because she believed her placement on administrative leave was discriminatory.” Dist. Ct. Op. 19 n. 14. Ms. Nettle contends that the district court erred by reading her retaliation charge this “narrowly,” and that the protected activity for which she suffered retaliation included earlier internal complaints to her superiors and coworkers.
Ms. Nettle is correct that “informal complaints” can be considered as protected activity. E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 804 (10th Cir.2007) (prohibition against retaliation “protects conduct short of filing a formal charge”). The issue before us is whether her second charge included a claim of this sort of protected activity.
*920 The relevant part of Ms. Nettle’s second charge read that she believed she had been retaliated against “for complaining of protected activity in my above-mentioned charge.” R. 33. There is some garbled syntax here. (Why would she be retaliated against for complaining of protected activity?) But the meaning of the charge seems straightforward: Ms. Nettle charged that she had been terminated because she complained about discrimination in “the above-mentioned charge,” which was her first Charge of Discrimination before the EEOC. Moreover, the “particulars” of the charge support this straightforward reading. In her second charge, Ms. Nettle recites that she filed her first charge of discrimination on October 22 and was fired on November 1. She then identifies who notified her of her termination and then concludes with the statement in question (“I believe I have been retaliated against ... ”), with no mention of any other protected activity. Further evidence in support of the district court’s interpretation: Ms. Nettle entitled the second cause of action in her complaint “retaliation for filing a charge of discrimination.” R. 16.
We agree with Ms. Nettle that we must read her charge liberally. Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 836 (8th Cir.2000); Brown v. Hartshorne Pub. Sch. Dist. No. 1, 864 F.2d 680, 682 (10th Cir.1988). But we cannot read her charge to include conduct she did not mention. While we can give her words a liberal construction, filling in gaps and reading vague terms expansively, we are not entitled to invent “ex nihilo, a claim which simply was not made.” Kells, 210 F.3d at 836. The investigation called for by the language of the charge is obvious and limited: to see whether she had been retaliated against for filing her first charge of discrimination. Such claims are familiar in retaliation cases. See, e.g., Denetclaw v. Thoutt Bros. Concrete Contractors, Inc., 287 Fed.Appx. 17, 20 (10th Cir.2008) (charge read “I believe that I have been terminated in retaliation for filing a Charge of Discrimination”); Ross v. Potter, 119 Fed.Appx. 209, 210 (10th Cir.2004) (“Ross alleged ... retaliation for filing a charge of discrimination”). If Ms. Nettle believed that she was retaliated against for other activity, in addition to her filing of the EEOC charge, she could have filed a new charge. See Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir.2004) (holding that each discrete retaliatory action constitutes its own “unlawful employment practice for which administrative remedies must be exhausted” (citation omitted)).
Moreover, even if Ms. Nettle’s EEOC charge could be interpreted as expansively as she now asks, her complaint in district court was expressly limited to “retaliation for filing a charge of discrimination.” R. 30. Whatever may be the reasons for liberal construction of an uncounselled EEOC charge, it is well established that claims not made in district court are waived. United States v. Rogers, 556 F.3d 1130, 1136 (10th Cir.2009). Accordingly, we affirm the district court in granting summary judgment to the Clinic on her retaliation claim.
III. Discrimination on the Basis of Color
A. Hostile Work Environment
Title VII of the Civil Rights Act proscribes employment practices that “permeate the workplace with ‘discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.’ ” Tademy v. Union Pacific Corp., *921 520 F.3d 1149, 1156 (10th Cir.2008) (internal citation and quotation omitted). “Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII’s purview.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The district court held that “some of the comments and remarks” of her co-workers and supervisors could have caused Ms. Nettle subjectively to perceive that her working environment was hostile and abusive. Dist. Ct. Op. 13-14. But it also held that “from the objective standpoint,” the “harassment or offensive conduct over the thirteen-year employment period was not sufficiently constant or frequent ... that it could be considered sufficiently pervasive or severe to survive summary judgment.” Id. at 15.
The district court highlighted three deficiencies it saw in Ms. Nettle’s case. First, it noted that, although Ms. Nettle had “named many individuals who she ... contended harassed her .... [she] has not attributed offensive remarks to many of these alleged harassers, and she has not described the exact nature of many of the comments.” Dist. Ct. Op. 14. Second, it noted that Ms. Nettle “had admitted that she cannot recall with any specificity the dates when many ... comments were made.” Id. Finally, although Ms. Nettle claimed to have been subjected to discrimination throughout her employment, “she has conceded that ‘[19]96 ... until [19]99 were good years” and that she did not recall that Mr. Hunter directed any offensive comments at her during that time, except in jest. Id. at 15; see R. 242-43 (describing that in those years Mr. Hunter would “speak with [her] ... [and] promote any activities that [she] initiated or attempted to initiate or present; any requisition or anything [she] requested in regard to [her] youth groups wasn’t denied.”).
Ms. Nettle asks us to reverse the district court’s holding. Her brief points to several pages in the record which summarize “the instances of discrimination because of her skin color” that Ms. Nettle alleges she has suffered. Aplt. Br. at 27. These stated instances suffer from many of the problems that the district court identified in its opinion. Dates are left unspecified. Ms. Nettle admitted again and again that she could not recall the dates or events at which Mr. Hunter allegedly made the discriminatory comments. R. 167, 88-89. She also identified other people as making discriminatory remarks, but likewise could not give specific dates or events at which they were made. R. 90-91, 93, 95. Many of her allegations against Mr. Hunter are vague. In her deposition, she said that “[i]n 1993 in all staff meetings,” there would always be “at least one discriminatory or racial slur against different tribal affiliations or lighter-skinned people,” and from “1993 to [her] termination date there were statements of discrimination by Mr. Hunter.” R. 88-89. In short, “[everything in a negative nature” came from Mr. Hunter. R. 250.
Some of this vagueness is inconsequential. A hostile work environment claimant need not establish precise dates for every insult. After all, the point of such claims is that the discrimination was ongoing and pervasive, that is, all the time, and not at isolated points in time. See, e.g., Rocha Vigil v. City of Las Cruces, 119 F.3d 871, 875 (10th Cir.1997). Moreover, Ms. Nettle does recall some specific remarks by Mr. Hunter and others. She testified that Mr. Hunter commented that Ms. Nettle *922 “thinks she’s Indian, but we wonder. We have been trying to get rid of her since the day we hired her.” R. 167-68. Mr. Hunter also said, according to Ms. Nettle, that people who did not look Indian “don’t represent the Indian community well.” [1] R. 246. In addition, she points to specific remarks by other clinic members, for example, Daren Paddyaker’s remark that Ms. Nettle was a “wannabe Indian,” and Dawn Singleton’s comment that she was the “white counselor.” R. 224, 232. Affidavits from other employees allege that Robyn Sunday, the Chief Operating Officer of the clinic, referred to Ms. Nettle as “the big-boobed white Renee” on several occasions. R. 366, 369. Moreover, affidavits from two employees allege that those who did not appear “Indian” were treated differently at the Clinic. R. 359, 365. Finally, she alleged that child patients at the Clinic, and their parents, would sometimes refer to her as “white doctor.” R. 237.
A hostile work environment is one that is “permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.” MacKenzie v. City & County of Denver, 414 F.3d 1266, 1280 (10th Cir.2005). It is not the function of Title VII to make a federal case out of every insulting or unpleasant remark, even those related to protected status. “[M]ere utterance of an ... epithet which engenders offensive feelings in a employee ... does not sufficiently affect the conditions of employment to implicate Title VII.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (quotations and internal citation omitted). Rather, a hostile work environment is one that a “reasonable person would find hostile or abusive.” Id. This generally entails a “steady barrage of opprobrious [ ] comments.” Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir.2007) (quoting Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir.2005)); Ford v. West, 222 F.3d 767, 777 (10th Cir.2000) (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir.1994)).[2]
We do not believe that the district court erred in finding that Ms. Nettle’s allegation of discrimination does not meet this standard. Ms. Nettle’s allegations of identifiable discriminatory or harassing conduct constitute “sporadic ... slurs” rather than a “steady barrage of opprobrious ... comments.” Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir.1994). We also note, as did the district court, that Ms. Nettle was employed by the Clinic for over a decade, and that she conceded that she was treated favorably for a significant portion of that time, from 1996 to “around 1999.” R. 242; see Dist. Ct. Op. 14-15.
Ms. Nettle’s claims that Mr. Hunter would make “frequent” racial comments at staff meetings and was generally “negative,” as well as the statements by her coworkers that there was discrimination at the clinic, do not rise to the level of creating a genuine dispute. Ms. Nettle’s claim that from “1993 to [her] termination date *923 there were statements of discrimination by Mr. Hunter,” R. 89, is overly vague both as to pervasiveness and as to severity. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 674 (10th Cir.1998) (“Vague, concluso-ry statements do not suffice to create a genuine issue of material fact.”); see also Quevedo v. Trans-Pacific Shipping, Inc., 143 F.3d 1255, 1257 (9th Cir.1998) (noting that Fed.R.Civ.P. 56(e) provides that party opposing summary judgment must “set forth specific facts that show there is a genuine issue for trial.”). Ms. Nettle testified that at “every staff meeting” in 1993'— a decade before she lodged her complaint with the EEOC — Mr. Hunter made “at least one” racial slur, R. 88, but after that she offers no evidence regarding the frequency of his offensive remarks, other than to say that “ ‘96 to around 1999 were favorable years for me in regard to the treatment.” R. 242. Nor does she supply much detail about the content of his comments. It is not even clear that most of Mr. Hunter’s comments were directed at her, or at persons of her ethnicity. She describes comments he made about Comanches, Cheyennes, and Cherokees, but those are not her tribes.[3] Although there is some confusion about this in the record, Ms. Nettle understood that Mr. Hunter’s ethnic makeup was similar to her own: both being half Caucasian, and both affiliated with the Delaware Nation and the Caddo. It cannot be assumed that all of his “comments about different tribes, and about those whose skin is lighter or darker than others,” R. 390, related to her.
Nor do any of the particular comments recalled by Ms. Nettle strike us as sufficiently severe or opprobrious (considered objectively) that a reasonable jury would regard them “altering] the conditions of the victim’s employment and creat[ing] an abusive working environment.” MacKenzie, 414 F.3d at 1280. Certainly none of the comments directed at (or around) Ms. Nettle rose to the level of being physically threatening or humiliating. Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir.2005) (in determining hostile work environment, factors to be considered include whether the discriminatory conduct is “physically threatening or humiliating, or a mere offensive utterance”). Many of the statements she complains about simply identify her as “white” or as not really an Indian.'[4] Ms. Nettle testified that she “heard once” that Mr. Hunter said that the Delaware Tribe “was the tribal wannabes.” R. 241. We can easily understand that it could be annoying and irritating for a person of one racial mix to be mistaken for another, but there is no precedent for regarding a mistaken racial identifier — not employing any epithetical terminology — as opprobrious or abusive.
Moreover, as Ms. Nettle concedes, many of the comments were made jokingly. See, e.g., R. 219 (board president “making jest *924 of Cherokees”)[5]; id. at 220-21 (Dawn Singleton would “joke” about not going anywhere because she was not Indian and had blonde hair and green eyes); id. at 224 (Tracy Mailo would make “statements in jest at meetings regarding my skin color”); id. at 226 (explaining that she would interpret comments made “in jest ... to be in light or not wanting to offend as much as in regard to statements being made that are intended to be disparaging in nature” and stating that “many” of Mr. Hunter’s comments “were intended to be in jest”); id. at 229 (offering that she no longer found a staff member’s comments offensive because as “the years wore on ... I knew she didn’t mean [them] disparagingly”); id. at 241 (“[m]ost times” Mr. Hunter said something about a tribe it was “in jest.”). Where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having “alter[ed] the conditions of the victim’s employment and create[d] an abusive working environment.” Harris, 510 U.S. at 22, 114 S.Ct. 367.
The dissent merits a reply on three points. First, noting that some of Ms. Nettle’s patients, or the parents of her patients, would call her the “white doctor,” Aplt. Br. 37, R. 237-39, the dissent maintains that comments made by patients at the Clinic are “relevant to the present inquiry” and that it is not “determinative” that “the patients were not employees of the clinic.” Dissent 934. While our precedent does not categorically exclude comments made by patients or customers from consideration of a hostile work environment, we believe such claims are of little significance in the context of this case. Ms. Nettle’s patients were children, and there is no reason to think that their (or their parents’) identification of her as the “white doctor” was malicious, intended to be hurtful, or anything other than mistaken ethnic identification. Ms. Nettle testified that although she went through a stage where it hurt her to be called “white doctor,” and that this would make her “angry sometimes,” she “dealt with the children,” who trusted her, and she “didn’t find [the comments] as a problem at the very end” because she was so busy. R. 237. Moreover, Ms. Nettle presents no evidence that her employer encouraged her patients to refer to her as the “white doctor,” as opposed to “Ms. Nettle,” only that her co-workers would “hear” patients or their parents calling her white doctor and “participate in it.” R. 239.
The dissent cites Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1073 (10th Cir.1998) to support its assertion that employers may be held responsible for the conduct of their customers, but the facts of Lockard are suggestive in defining the limitations on the argument. In Lockard, Ms. Lockard had been subjected to crude, sexually harassing comments and physically threatening conduct (grabbing her hair and breast) from a group of customers. Id. at 1072. When told that she did not want to serve the harassing customers, as she had on three previous occasions, her employer responded that she was “hired to be a waitress” and that she needed to go serve them. Id. at 1067, 1074-75. Both the nature of the comments and the character of the employer’s actions are obviously far afield from those that confronted Ms. Net *925 tie at the Indian Clinic. We do not believe the facts show that Ms. Nettle’s employer “condone[d] or tolerate[d]” a hostile work environment based on the scattered comments of her patients or their parents. Id. at 1073-74.
Second, the dissent downplays the fact that many of the relevant comments were made in jest. The dissent claims that the “[wjhether a comment is intended to be insulting or ‘in jest’ is irrelevant to whether there is a steady barrage of opprobrious comments.” Dissent 931. But the case cited by the dissent holds only that comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment. EEOC v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir.2007). In that case, we held that vulgar e-mail not intended for a recipient, but nonetheless intercepted by her, could be evidence of discrimination. This does not mean that the nonmalicious character of comments, as understood both by the speakers and by the recipient of the messages, is “irrelevant” to whether they create a “hostile” or abusive work environment. PVNF does not hold otherwise, and our caselaw supports the point, under circumstances arguably more humiliating than these. See, e.g., Denetclaw v. Thoutt Bros. Concrete Contractors, 287 Fed.Appx. 17, 22 (10th Cir.2008) (discrimination against Native American who was frequently asked to perform “rain dances” found not to be severe in part because plaintiff himself “characterized [the remarks] as joking and kidding”).
Of course, what is funny to one person may be deeply offensive to another. What the speaker intended by his remark is not dispositive, and racial insults are not permissible merely because the speaker regards them as humorous. But Ms. Nettle herself says that she interpreted many of the comments made by Mr. Hunter and others as joking, and not disparaging, because she knew they were not intended to offend. See R. 240 (calling the years 1996-1999 as “good years” in which Mr. Hunter did not say anything “directly in regard to [Ms. Nettle] other than in jest.”); id. at 241 (distinguishing between comments that were “in jest” and those that were “disparaging”). When evaluating the totality of the circumstances, we cannot disregard the distinction between jesting and insulting.
Third, the dissent takes us to task for failing to consider the fact that Ms. Nettle was not selected to represent the Clinic at certain events in our analysis of the “totality of circumstances” analysis in the previous section. Dissent 934-35. In her testimony, Ms. Nettle pointed to not being allowed to attend the Heritage Celebration at the state capítol and a Oklahoma University Health Sciences Center event, allegedly because as a light-skinned Native American, she did not “represent” Native Americans well. R. 264; see also R. 362. We disagree that not being able to attend two events which, as we note in the following section, were only at best a discretionary part of her job, amounts to discrimination that is “severe.” Nor does the fact of being prevented from attending two events from a many-year career show that Ms. Nettle experienced “pervasive” discrimination during her employment at the Clinic.
From the record, we can see that at many points during her employment, the Clinic was not a pleasant place for Ms. Nettle to work. People said crude things, pet projects were taken away from her, and she was made to feel singled out because of her Caucasian appearance. But Title VII’s standard for redress is a hostile *926 work environment, not an unpleasant one. See, e.g., Duncan v. Manager, Dept. of Safety, City & County of Denver, 397 F.3d 1300, 1313-14 (10th Cir.2005) (Title VII provides no remedy for boorish behavior or bad taste); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1366 (10th Cir.1997) (unpleasant and boorish conduct does not create a hostile work environment). Incidents spread out over many years, and which indicate mostly poor taste and lack of professionalism, do not rise to the level of a hostile work environment. See, e.g., Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1263 (10th Cir.1998). With all due respect to the dissent, we believe that the dissent’s standard for pervasiveness and severity falls short of what this court and the Supreme Court have set forth, and would make a broad swath of American workplaces subject to liability under Title VII.
We therefore affirm the district court’s ruling that the Indian Clinic is entitled to summary judgment on Ms. Nettle’s hostile work environment claim.
B. Adverse Employment Action
Under Title VII, an employer may not “discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l). In order to show discrimination Ms. Nettle must establish that (1) she is the member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class. Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir.2007). The Clinic does not dispute that Ms. Nettle is in a protected class, which she has “described as ‘light-skinned Native Americans.’ ” Dist. Ct. Op. 16. The district court, however, agreed with the Clinic that Ms. Nettle failed to make the necessary primary showing that she had suffered an adverse employment action. Id. at 18.
Ms. Nettle concedes that in the period identified in her first EEOC charge— March 10, 2004 to October 20, 2004 — she “did not lose any salary nor receive an official demotion” but that nonetheless “the evidence shows that the terms and conditions of her employment were altered.” Aplt. Br. 38-39. Ms. Nettle points to the removal of Thanksgiving and Christmas Drives from her job functions (programs which she had started); her relocation to a new office; not being allowed to set up a booth at the Oklahoma University Health Sciences Center; and being pulled from attending Native American Heritage week at the state capital, among other things. R. 168-69, 362. It is not evident from the record that the removal of the Thanksgiving and Christmas programs occurred within the time period in which Ms. Nettle alleged discrimination, but even if it did, we do not see any of the events cited by Ms. Nettle affecting her terms and conditions of employment. Although we take a “case by case approach,” and do not limit ourselves to finding monetary loses or loss of benefits to constitute an adverse action, the action must rise above the level of “a mere inconvenience or an alteration of job responsibilities.” Sanchez v. Denver Pub. Sch., 164 F.3d 527, 582 (10th Cir.1998).
Ms. Nettle’s job description included a clause that said she would be required to “perform[j other duties as assigned.” R. 205, 404. She said in her deposition that she considered the Thanksgiving and *927 Christmas drives to be part of the assigned duties. R. 206. But there is no inconsistency with the job description that some duties, once assigned, should later be unassigned as necessary. Moreover, the various additional duties she was given do not reach the core of the description of her position as “Native American Youth Specialist”: “to provide Health Promotion/Disease Prevention services directed towards American Indian youth for the Community Services Department.” R. 403. The fact that Ms. Nettle was prevented from attending some external events does not represent a significant change in her employment status. See Piercy, 480 F.3d at 1203 (adverse employment action includes “significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” (citation omitted)).
Because we hold that Ms. Nettle did not suffer an adverse employment action, we do not reach the other steps in the test for showing discrimination.
IV. National Origin Discrimination
Ms. Nettle finally argues that she should be able to make a claim for national origin discrimination, even though she did not check off “national origin” on her first EEOC charge. The “particulars” of the charge stated that Ms. Nettle and other employees were “being treated differently because of [their] bribe or skin color.” R. 18 (emphasis added). She also alleged in the particulars that during meetings, Mr. Hunter would “make comments about different tribes.” Id. (emphasis added). The district court found that because Ms. Nettle did not “identify national origin as a basis for discrimination in her EEOC” charge (by not checking the box), she had not administratively exhausted her claim. Accordingly, it did not permit Ms. Nettle “to expand the scope of [her] lawsuit and include at this late date” a national origin claim. Dist. Ct. Op. 24.
The Ninth Circuit, in a case cited by Ms. Nettle, held that discrimination against an Indian tribe could give rise to a national origin claim under Title VII, because Indian tribes could be “considered nations.” Dawavendewa v. Salt River Project Agr. Imp. & Power Dist., 154 F.3d 1117, 1120 (9th Cir.1998) (different Indian tribes “were at one time considered nations, and indeed still are to a certain extent”). The Clinic does not challenge the very idea of national origin discrimination based on membership in a tribe in its brief before us, so we assume without holding that one can bring a legitimate claim of national origin discrimination based on discrimination against one’s tribe.
We must therefore consider whether Ms. Nettle can be said to have made such a claim in her original charge. To “effectuate the remedial purposes of Title VII,” courts are to liberally construe charges filed with the EEOC. Harrell v. Spangler, Inc., 957 F.Supp. 1215, 1219 (D.Kan.1997). Accordingly, “the crucial inquiry is whether the claims set forth in the civil complaint fall within the scope of the investigation that could reasonably be expected to grow out of the EEOC charges.” Id. Although Ms. Nettle did not check the box for national origin in her charge, she did state, in the particulars, that she believed she was being discriminated against because of her tribe. Moreover, in her complaint, Ms. Nettle explained that Mr. Hunter “made statements regarding the Delaware Tribe ... as being want-to-be’s which indicates Plaintiff wants *928 to pretend and be like Indians of browner skin.” R. 26. Mr. Hunter, the complaint continued, “also made statements regarding Cheyenne-Arapaho Tribal employees, Comanche employees, Cherokee and Choctaw Tribal employees.” Id.
It seems clear from the charge that Ms. Nettle was alleging national origin discrimination, and that it provided adequate notice to the Clinic. See Stephens v. City of Topeka 33 F.Supp.2d 947, 950 (D.Kan.1999). In Stephens, the plaintiff did not check the box “race” on his charge, and wrote in his charge that “I believe I was treated differently because of my National Origin and my age, because younger, white managers/employees ... were treated differently.” Id. The district court held that because Mr. Stephens said he was treated differently from other “white” employees, this suggested he was (also) making an allegation of racial discrimination. Id. In this case, as well, Ms. Nettle made claims in her charge related to Mr. Hunter’s comments about various other tribes, claims which relate to Ms. Nettle’s national origin.
In her Complaint in district court, however, Ms. Nettle did not allege discrimination based on tribe or national origin. Her Complaint alleged discrimination “on account of race and color” alone. Only in her reply to the Clinic’s motion for summary judgement did Ms. Nettle drop her claim of race discrimination only to ask to be “allowed to maintain a cause of action for national origin discrimination.” R. 191.
As noted above, plaintiffs are confined to the claims they timely raise in their complaint. A plaintiff “may not amend her complaint through allegations made in response to a motion for summary judgment.” Griffin v. Potter, 356 F.3d 824, 830 (7th Cir.2004). Here, concerns about proper notice come to the fore. Indeed, part of the Clime’s strategy in its motion for summary judgment was to concede that Mr. Hunter had made comments about Ms. Nettle’s tribal affiliation, but to argue that statements about tribal affiliation could not support a claim for race or color discrimination, which is what Ms. Nettle alleged. R. 59. It hardly seems fair that Ms. Nettle in reply, could argue that — all along — she was really alleging national origin discrimination, and that she should be allowed to proceed on those grounds, rather than the grounds which she presented in her Complaint. While Ms. Nettle’s charge could be read as encompassing a national origin discrimination claim, the same cannot be said of her Complaint.
Even if we were to read Ms. Nettle’s Complaint to encompass national origin discrimination, we doubt that it could withstand a motion for summary judgment. Ms. Nettle’s specific (i.e., not vague) race and national origin claims appear to rely on much the same information we have already considered in connection with her claim for color discrimination (for example, that some tribes had lighter skin color than other tribes, R. 12). We have already concluded that this evidence was insufficient to survive summary judgment. Unless Ms. Nettle has other facts, which she did not put forward even in her reply to the motion for summary judgment, then the facts pertaining only to national origin discrimination make up a smaller set of the available facts pointing to discrimination of any kind. If she did not survive summary judgment on the larger set of facts, a fortiori, she could not survive it with the smaller set.
V. Conclusion
We AFFIRM the judgment of the district court.

 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

. It appears that Ms. Nettle heard this remark second hand from the human resources director. R. 246. In fact, the only specific remark from Mr. Hunter Ms. Nettle appears to have alleged was the "she claims she's Indian, but we wonder” line. See R. 397-98.

. The dissent complains that these precedents have "improperly converted a disjunctive analysis,” 'severe or pervasive,' into a conjunctive analysis, requiring "severe and pervasive.’ " Diss. Op. 933 n. 4. But that is the governing law in this circuit, and Appellant has not asked us to revisit it.

. Ms. Nettle testified that Mr. Hunter "had said things about the Cherokees, something about a room full of Cherokees makes like a full blood or something like that. And then he, you know, joked in there because I was diere and I think he added the Delaware Tribe in on it.” R. 241-42. From her testimony, it does not appear that Mr. Hunter bore any particular animus against Ms. Nettle's tribe.

. The dissent focuses on Robyn Sunday's alleged description of her as "the big-boobed white Renee.” R. 366, 369. But the sting in the comment is its sexism, and Ms. Nettle has not complained of sex discrimination.

. The transcript of Ms. Nettle’s testimony spells the word as "gist” rather than “jest." Because the context makes clear Ms. Nettle was speaking of "jesting” behavior, we have altered the transcript. See R. 91 (“Q. What do you mean, in gist? A. Just joking ... ”).